TOWN OF ALMA, Colorado, a Colorado municipal corporation; James J. Shanks, Thomas J. Johnson, Todd Mcmanus, Thomas Sageous Greising, Donald Davis, and Taylor Roberts, Petitioners,

v.

AZCO CONSTRUCTION, INC., a Colorado corporation, and Employers Mutual Casualty Company, an Iowa corporation, Respondents.

No. 99SC424.

Supreme Court of Colorado,
En Banc.

Sept. 18, 2000.

Hayes, Phillips & Maloney, P.C., Herbert C. Phillips, Kendra L. Carberry, Denver, Colorado, Attorneys for Petitioners.

Meconi & Jackson, P.C., Brenda L. Jackson, Canon City, Colorado, Attorneys for Respondents.

Justice RICE delivered the Opinion of the Court.

We issued a writ of certiorari to review the court of appeals' judgment in *Town of Alma v. AZCO Constr., Inc.*, 985 P.2d 56 (Colo.App. 1999). The Town of Alma, joined by several individual town residents, filed suit against AZCO Construction, Inc. ("AZCO"), asserting claims for breach of contract, breach of the implied warranty of sound workmanship, and negligence. The trial court dismissed Petitioners' negligence and breach of implied warranty of sound workmanship claims and a jury returned a verdict for AZCO on the breach of contract claim. Petitioners appealed the trial court's dismissal of its negligence and breach of implied warranty of sound workmanship claims and the court of appeals affirmed the dismissal of the claims. We granted Petitioners' petition for writ of certiorari to review the court of appeals' judgment affirming the trial court's dismissal of

Petitioners' negligence claim. We now affirm the judgment of the court of appeals.

## I. FACTS AND PROCEDURAL HISTORY

Petitioners' amended complaint alleged the following facts.[1] On October 28, 1992, the town and AZCO entered into a contract for the construction of improvements to Petitioners' water distribution system. The contract called for AZCO to install new water mains, and to tie those water mains to existing water service lines which served residential properties in the town. Pursuant to the contract, AZCO agreed to furnish all labor, equipment, and materials for the connection of the existing water service lines with the new water mains. The contract contained two separate warranty provisions. Section 29.1 of the contract, titled "GUARANTEE," provided, "[AZCO] shall guarantee all materials and equipment furnished and WORK performed for a period of one (1) year from the date of SUBSTANTIAL COMPLETION. [AZCO] warrants and guarantees ... that the completed system is free from all defects due to faulty materials or workmanship...." In addition, section 3.3.1 of the "Special Conditions" attached to the contract, titled "MAINTENANCE AND GUARANTY," provided, "[AZCO] hereby guarantees that the entire work constructed by [it] under the contract will fully meet all requirements of the contract as to quality of workmanship and materials.... [AZCO] hereby agrees to make at [its] own expense, any repairs or replacement made necessary by defects in materials or workmanship supplied by [it] that become evident within one year after the date of final payment...."

In 1993, AZCO installed 115 flared fittings for the water service line connections. In June 1995, Petitioners discovered leaks in three water service line connections that AZCO installed pursuant to the contract. AZCO repaired those three leaks under the one-year warranty provision of the contract.

In November 1995 and June 1996, additional leaks in water service line connections were discovered but AZCO refused to repair these leaks on the basis that the one-year warranty provision had expired. The leaks were repaired at the expense of individual town residents.[2]

Petitioners filed suit against AZCO on November 27, 1996, asserting claims for breach of contract, breach of the implied warranty of sound workmanship, negligence per se, and negligence. Two more leaks were discovered in June 1997, after Petitioners had filed their original complaint against AZCO, and AZCO again refused to repair the leaks. Petitioners subsequently filed an amended complaint seeking damages for the cost to repair or replace every water service line connection installed or repaired by AZCO.

Petitioners voluntarily dismissed their negligence per se claim and AZCO moved to dismiss the breach of implied warranty of sound workmanship and negligence claims. The trial court granted AZCO's motion to dismiss these claims and the case proceeded to trial on the breach of contract claim only, with the jury returning a verdict for AZCO on this claim. AZCO moved unsuccessfully for an award of attorney's fees based on a provision of the contract providing that the successful party in any litigation shall be entitled to reasonable legal expenses as part of any judgment.

Petitioners appealed the trial court's dismissal of its breach of implied warranty of sound workmanship and negligence claims, and AZCO cross-appealed the trial court's order denying its request for attorney's fees. The court of appeals affirmed the trial court's dismissal of Petitioners' claims, but reversed the trial court's order denying AZCO's motion for attorney's fees and remanded for a hearing on the attorney's fees. In affirming the dismissal of Petitioners' negligence claim, the court of appeals relied on the economic loss rule and stated that "[t]o

---

1. As we are reviewing the dismissal of Petitioners' negligence claim pursuant to C.R.C.P. 12(b)(5), we accept all averments of material fact contained in the complaint as true. *See Coors Brewing Co. v. Floyd,* 978 P.2d 663, 665 (Colo. 1999).

2. Town of Alma Ordinance #1986-3 requires resident landowners to maintain water service lines at their own expense.

hold otherwise would permit the non-breaching party to avoid the contractual limitation of remedy." *Town of Alma*, 985 P.2d at 57.

We granted certiorari to review the dismissal of Petitioners' negligence claim and the reversal of the order denying attorney's fees.[3]

## II.  ANALYSIS

This case, along with *Grynberg v. Agri Tech, Inc.*, 10 P.3d 1267 (Colo. 2000), presents an opportunity for us to address the status of the economic loss rule in Colorado. The rule has been applied by our court of appeals in various contexts to bar tort claims. As this is a matter of first impression, our analysis encompasses an examination of the development of the rule in other jurisdictions, as well as a discussion of the principles and rationale underlying the rule.

### A.  Standard of Review

We are reviewing the trial court's grant of AZCO's motion to dismiss Petitioners' negligence claim pursuant to C.R.C.P. 12(b)(5).[4] This rule is designed to allow defendants to test the formal sufficiency of the complaint. *See Coors Brewing Co.*, 978 P.2d at 665. In evaluating a Rule 12(b)(5) motion, trial courts may consider only those matters stated in the complaint and must accept all allegations of material fact as true and view the allegations in the light most favorable to the plaintiff. *See id.* When reviewing cases involving a trial court's ruling on a motion to dismiss pursuant to Rule 12(b)(5), we apply these same standards.[5] *See id.*

### B.  Origins of the Economic Loss Rule

Broadly speaking, the economic loss rule is intended to maintain the boundary between contract law and tort law. Although these two areas of law traditionally occupy discrete spheres of legal practice, the distinction between the two blurs. This becomes problematic when, as in this case, a commercial buyer seeks to use a tort theory to recover damages for a defective product.

The economic loss rule emerged largely from the development of products liability jurisprudence. As courts abandoned the requirement for privity in contract, the doctrine of strict liability in warranty developed with the leading case of *Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 161 A.2d 69 (1960). The *Henningsen* court held that an automobile manufacturer and a dealer were liable to the automobile purchaser's wife, who was driving the car when she was injured, on a theory of implied warranty of safety. *See id.* at 84. The *Henningsen* decision was quickly followed by a flood of cases from other jurisdictions extending the implied warranty theory to many other products. *See* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 97, at 690 (5th ed.1984) [hereinafter *Prosser and Keeton* ]. The use of the implied warranty theory, however, generated numerous difficulties as courts struggled to apply contract rules to implied warranty cases. Courts proceeded on the assumption that contract rules must apply because these were "warranty" actions,

3.  We granted certiorari on the following issues:

  1.  Whether the court of appeals erred in applying the economic loss rule to bar Petitioner's negligence claim.
  2.  Whether the court of appeals erred in ruling that Petitioners could be liable for attorney's fees despite the lack of appropriation for such fees.

  We denied the petition for review of the dismissal of Petitioners' breach of implied warranty of sound workmanship claim.

4.  The parties disagree over whether the trial court's order constituted a dismissal of the claim pursuant to C.R.C.P. 12(b)(5) or the granting of a summary judgment motion pursuant to C.R.C.P. 56. Our review of the record indicates that

AZCO moved for summary judgment on the breach of contract claim, which was denied by the trial court, and for dismissal pursuant to C.R.C.P. 12(b)(5) on the negligence claim, which was granted.

5.  Petitioners assert that the court of appeals applied an incorrect standard of review to its appeal when it stated that, "because the record here provides support for the court's finding that all damages sought are provided for in the parties' construction contract, we conclude that the trial court did not err in its application of the economic loss rule." *Town of Alma*, 985 P.2d at 57. To the extent that this language can be read as applying a deferential standard of review under C.R.C.P. 12(b)(5) to the trial court's order, we disapprove of it.

though there was often no contract involved. *See id.* at 690–91.

In response to the difficulties of attempting to apply contract rules to products liability cases in the absence of a contract, courts moved away from the implied warranty theory of recovery and adopted a strict liability in tort theory. A tort theory based on the dangerousness of conduct was considered more appropriate and more adaptable than a contract theory because the policy reasons courts were supplying to justify the imposition of strict liability go far beyond any conventional contract notions. *See id.* at 692. The California Supreme Court led the way with its decision in *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897, 900 (1963)(holding a manufacturer strictly liable in tort for injury to plaintiff caused by defective power tool), and the American Law Institute followed with the final adoption of section 402A [6] of the Second Restatement of Torts the following year. *See id.* at 694.

As courts made the shift to employing tort law for these products liability cases, a need developed to prevent tort law from "swallowing" the law of contracts. After paving the road to allow tort theories to proceed in products liability cases, the California Supreme Court, in *Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965), was the first to adopt the economic loss rule and to recognize the importance of limiting the use of tort theories. In *Seely*, the plaintiff purchased a truck manufactured by White Motor Company ("White") for use in his business and the truck subsequently overturned when the brakes failed. The plaintiff was not injured but he sued White for damages for the repair of the truck as well as damages to recover the purchase price and the lost profits in his business. The California Supreme Court refused to allow the plaintiff to use a strict liability in tort theory to recover damages for the purchase price and for the profits lost in his business. *See id.* at 151–52. The court explained the rationale for limiting tort recovery in these situations:

> The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the "luck" of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety in terms of conditions that create unreasonable risks of harm. He cannot be held liable for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands. A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will. *Even in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone.*

*Seely*, 45 Cal.Rptr. 17, 403 P.2d at 151 (emphasis added). From this final statement, the economic loss rule was born.

We adopted section 402A's strict liability in tort theory in *Hiigel v. General Motors*

---

6. Section 402A provides:

**§ 402A SPECIAL LIABILITY OF SELLER OF PRODUCT FOR PHYSICAL HARM TO USER OR CONSUMER**
(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
 (a)the seller is engaged in the business of selling such a product, and
 (b)it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although
 (a)the seller has exercised all possible care in the preparation and sale of his product, and
 (b)the user or consumer has not bought the product from or entered into any contractual relation with the seller.

*Corp.*, 190 Colo. 57, 64–65, 544 P.2d 983, 989 (1975). Although not reaching as far as the *Seely* court,[7] we endorsed the principles underlying the economic loss rule when we declined to extend section 402A's strict liability doctrine to allow it to be used as a vehicle to recover commercial or business losses. *See id.* at 989.

Subsequent to the *Seely* decision, many jurisdictions adopted a form of the economic loss rule. The United States Supreme Court adopted a version of the rule in *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). In *East River*, charter operators of oil supertankers sued the manufacturer of turbines used for ship propulsion after the turbines malfunctioned, seeking damages for the cost of repairing the turbines and for income lost while the ships were out of service. *See id.* at 861, 106 S.Ct. 2295. The suit originally contained both contract and tort claims but the contract claims were subsequently dropped because of a statute of limitations defense, leaving only the tort claims. *See id.* The Court held that although admiralty law incorporated products liability principles, there was no cause of action in tort, under either negligence or strict liability, for damage caused when a product malfunctions and causes purely economic loss through damage to the product itself. *See id.* at 876, 106 S.Ct. 2295. In reaching its holding, the Court cited *Seely* and discussed the factors weighing against tort liability:

> When a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong.... Losses like these can be insured [through warranties].... The increased cost to the public that would result from holding a manufacturer liable in tort for injury to the product itself is not justified.

*Id.* at 871–72, 106 S.Ct. 2295. The Court continued by explaining how contract law is designed to account for the costs and risks of a product's nonperformance:

> Contract law, and the law of warranty in particular, is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreements. The manufacturer can restrict its liability, within limits, by disclaiming warranties or limiting remedies. In exchange, the purchaser pays less for the product. Since a commercial situation generally does not involve large disparities in bargaining power, we see no reason to intrude into the parties' allocation of the risk.

*Id.* at 872–73, 106 S.Ct. 2295. As discussed in more detail below, this principle that parties must be able to confidently allocate their risks and costs in a bargaining situation underlies the necessity for the economic loss rule.

Our court of appeals first adopted the economic loss rule in *Jardel Enterprises, Inc. v. Triconsultants, Inc.*, 770 P.2d 1301 (Colo. App.1988). In *Jardel*, the court refused to permit a restaurant owner to bring a negligence claim against a subcontractor for lost profits resulting from the delayed opening of the restaurant when the subcontractor misread the building plans and constructed the building foundation in the wrong location. *See id.* at 1302. The court cited the economic loss rule as the basis for its holding:

> As a general rule, no cause of action lies in tort when purely economic damage is caused by negligent breach of a contractual duty. This economic loss rule prevents recovery for negligence when the duty breached is a contractual duty and the harm incurred is the result of failure of the purpose of the contract.

*Id.* at 1303. A number of courts of appeals cases have applied the economic loss rule in varying contexts since the decision in *Jardel. See, e.g., Town of Alma*, 985 P.2d at 57 (this appeal); *Grynberg v. Agri Tech, Inc.*, 985 P.2d 59, 63 (Colo.App.1999) (holding that the economic loss rule bars negligence claim for failure to receive a particular return on cattle investment program); *Terrones v. Tapia*, 967 P.2d 216, 220 (Colo.App.1998) (holding that

---

7. Our discussion of limiting recovery for commercial or business loss was limited to strict liability in tort actions based on section 402A and, unlike the *Seely* court's discussion of negligence, we did not address other tort actions. *See Hiigel*, 190 Colo. at 64–65, 544 P.2d at 989.

the rule bars negligence claim for lost profits as a result of restaurant owner's inability to use drive-through window); *Chellsen v. Pena,* 857 P.2d 472, 477 (Colo.App.1992)(citing economic loss rule to bar action for negligent termination of employment); *Scott Co. of California v. MK–Ferguson Co.,* 832 P.2d 1000, 1005 (Colo.App.1991) (holding that the rule bars subcontractor's negligence claim because no independent duty was breached); *Centennial Square, Ltd. v. Resolution Trust Co.,* 815 P.2d 1002, 1004 (Colo.App.1991) (upholding dismissal of borrowers' negligence claim against lender because no independent duty was breached); *cf. Consolidated Hardwoods, Inc. v. Alexander Concrete Constr., Inc.,* 811 P.2d 440, 443 (Colo.App.1991) (allowing homeowner's negligence claim against subcontractor because independent duty was breached).

### C. Rationale Underlying the Economic Loss Rule

■ Although originally born from products liability law, the application of the economic loss rule is broader, because it serves to maintain a distinction between contract and tort law. The essential difference between a tort obligation and a contract obligation is the source of the duties of the parties.

■ Tort obligations generally arise from duties imposed by law. Tort law is designed to protect all citizens from the risk of physical harm to their persons or to their property. These duties are imposed by law without regard to any agreement or contract.

■ In contrast, contract obligations arise from promises made between parties. Contract law is intended to enforce the expectancy interests created by the parties' promises so that they can allocate risks and costs during their bargaining. Limiting tort liability when a contract exists between parties is appropriate because a product's potential nonperformance can be adequately addressed by rational economic actors bargaining at

arms length to shape the terms of the contract. For example, a buyer may demand additional warranties on a product while agreeing to pay a higher price, or the same buyer may choose to assume a higher level of risk that a product will not perform properly by accepting a more limited warranty in exchange for a lower product price. Limiting the availability of tort remedies in these situations holds parties to the terms of their bargain. In this way, the law serves to encourage parties to confidently allocate risks and costs during their bargaining without fear that unanticipated liability may arise in the future, effectively negating the parties' efforts to build these cost considerations into the contract. The economic loss rule thus serves to ensure predictability in commercial transactions.

The key to determining the availability of a contract or tort action lies in determining the source of the duty that forms the basis of the action.[8] We find the following discussion by the South Carolina Supreme Court informative:

> The question, thus, is not whether the damages are physical or economic. Rather the question of whether the plaintiff may maintain an action in tort for purely economic loss turns on the determination of the source of the duty [the] plaintiff claims the defendant owed. A breach of a duty which arises under the provisions of a contract between the parties must be redressed under contract, and a tort action will not lie. A breach of a duty *arising independently* of any contract duties between the parties, however, may support a tort action.

*Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.,* 320 S.C. 49, 463 S.E.2d 85, 88 (1995)(emphasis added).

Determining when a contract action will lie and when a tort action will lie requires maintaining this distinction in the sources of the respective obligations. The phrase "economic loss rule"[9] necessarily implies that the

---

8. As such, we believe that a more accurate designation of what is commonly termed the "economic loss rule" would be the "independent duty rule." However, for the sake of consistency, we will continue to refer to it as the economic loss rule.

9. While the economic loss rule serves today to maintain the distinction between contract and

focus of the inquiry under its analysis is on the type of damages suffered by the aggrieved party. However, the relationship between the type of damages suffered and the availability of a tort action is inexact at best. Examining the type of damages suffered may assist in determining the source of the duty underlying the action (e.g., most actions for lost profits are based on breaches of contractual duties while most actions involving physical injuries to persons are based on common law duties of care). However, some torts are expressly designed to remedy pure economic loss (e.g., professional negligence, fraud, and breach of fiduciary duty). It is here that substantial confusion arises from the use of the term "economic loss rule."

This confusion can be avoided, however, by maintaining the focus on the source of the duty alleged to have been violated. For example, we have recognized that some special relationships by their nature automatically trigger an independent duty of care that supports a tort action even when the parties have entered into a contractual relationship. *See, e.g., Bebo Constr. Co. v. Mattox & O'Brien, P.C.*, 990 P.2d 78, 83 (Colo.1999)(attorney-client relationship creates independent duty of care); *Greenberg v. Perkins*, 845 P.2d 530, 534 (Colo.1993)(physician-patient relationship creates independent duty of care, as does physician's independent medical examination of non-patient); *Farmers Group, Inc. v. Trimble*, 691 P.2d 1138, 1141–42 (Colo.1984)(quasi-fiduciary nature of insurer-insured relationship creates independent duty of care). We have also recognized that certain common law claims that sound in tort and are expressly designed to remedy economic loss may exist independent of a breach of contract claim. *See Brody v. Bock*, 897 P.2d 769, 776 (Colo.1995)(common law fraud claim is based on violation of a duty independent of contract); *Keller v. A.O. Smith Harvestore Prods., Inc.*, 819 P.2d 69, 73 (Colo.1991)(negligent misrepresentation is a tort claim based "not on principles of contractual obligation but on principles' of duty and reasonable conduct."). In these situations where we have recognized the existence of a duty *independent* of any contractual obligations, the economic loss rule has no application and does not bar a plaintiff's tort claim because the claim is based on a recognized independent duty of care and thus does not fall within the scope of the rule.[10]

### D. A Workable Economic Loss Rule: The Focus on Duty

We believe the principles underlying the rule, as discussed above, serve an important role and should be observed and applied in Colorado jurisprudence.[11] In recognition of its importance, we undertake here to formulate its content.

We have previously recognized a court's duty to determine, at the outset of a lawsuit, the type of duty that has allegedly been breached. In *Taco Bell v. Lannon* we described the court's function as such:

tort law, its continued designation as the "economic loss" rule is merely an unfortunate carryover from its origins in products liability jurisprudence.

10. In this regard we observe that although some jurisdictions have characterized these types of cases as "exceptions" to the economic loss rule, they are more appropriately viewed as simply outside the scope of the rule. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 46–47 (Tex.1998)(noting that fraudulent inducement claim in Texas is based on violation of independent duty, precluding application of economic loss rule).

11. A trial judge observed the following after presiding over a case involving duplicative contract and tort claims:

Ambiguity in the law breeds a multiplicity of claims, which breeds a geometrically increased

multiplicity of motions, which results in fees and expenses disproportionate to the amount in controversy.... The distinction between tort and contract is important. The distinction determines the measure of damages, the applicable statute of limitations and whether procedural prerequisites such as certificates of review must be followed.

Stephen Phillips, *Tort or Contract: A History of Ambiguity and Uncertainty*, 21 The Colorado Lawyer 241, 241 (1992); *see also Prosser and Keeton* § 92, at 655 ("The availability of both kinds of liability for precisely the same kind of harm has brought about confusion and unnecessary complexity. It is to be hoped that eventually the availability of both theories tort and contract for the same kind of loss ... will be reduced in order to simplify the law and reduce the costs of litigation.").

The question of whether a defendant owes a plaintiff a duty to act to avoid injury is a question of law to be determined by the court. The court determines, as a matter of law, the existence and scope of the duty that is, whether the plaintiff's interest that has been infringed by the conduct of the defendant is entitled to legal protection.

744 P.2d 43, 46 (Colo.1987)(internal quotation marks omitted, citations omitted); *see also University of Denver v. Whitlock*, 744 P.2d 54, 57 (Colo.1987); *Metropolitan Gas Repair Serv., Inc. v. Kulik*, 621 P.2d 313, 317 (Colo. 1980).

■■■ Consistent with this duty analysis, we now expressly adopt the economic loss rule. We hold that a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law.[12] Economic loss is defined generally as damages other than physical harm to persons or property.

### E. Application of the Rule

■■■ Turning to the facts before us, the contract in the instant case expressly assigned a duty of care to AZCO in the installation of the water system it was this contractual duty that AZCO allegedly breached. The provisions contained within the contract demonstrate that AZCO guaranteed its workmanship when it installed the water system. Section 29.1 of the Contract, titled "GUARANTEE," provided, "[AZCO] shall guarantee all materials and equipment furnished *and WORK performed* for a period of one (1) year.... [AZCO] warrants and guarantees ... that the completed system is free from all defects due to faulty materials *or workmanship.*" (Emphasis added.) In addition, section 3.3.1 of the "Special Conditions" attached to the contract, titled "MAINTENANCE AND GUARANTY," provided, "[AZCO] hereby guarantees that the entire work constructed by [it] under the contract will fully meet all requirements of the contract as to *quality of workmanship and materials....*" (Emphasis added.) These contractual provisions demonstrate that AZCO expressly assumed the duty to guarantee its quality of workmanship and its materials when it undertook to install the water system. As such, Petitioners have failed to demonstrate that AZCO breached any duty independent of its contractual obligations.

Moreover, the town and the individual landowners are only seeking damages for the cost of repair and replacement of the water lines that were the subject of the contract.[13] Damages for the cost of repair and replacement of property that were the subject of the contract constitute economic loss damages that must be supported by an independent duty of care to be recoverable in a negligence action. As there is no independent duty to support Petitioners' negligence claim, the economic loss rule bars this claim. *See Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.*, 236 Va. 419, 374 S.E.2d 55, 58 (1988) ("The effect of the failure of the substandard parts to meet the bargained-for level of quality was to cause a diminution in the value of the whole, measured by the cost of repair. This is a purely economic loss, for

12. The scope of this rule includes third-party contract beneficiaries who may have a cause of action for breach of contractual duties. "A basic rule of contract law is that 'a person not a party to an express contract may bring an action on such contract if the parties to the agreement intended to benefit the non-party, provided that the benefit claim is a direct and not merely an incidental benefit of the contract.'" *Jefferson County Sch. Dist. No. R–1 v. Shorey*, 826 P.2d 830, 843 (Colo.1992)(*quoting E.B. Roberts Constr. Co. v. Concrete Contractors, Inc.*, 704 P.2d 859, 865 (Colo.1985)). The individual residents alleged in the amended complaint: "Plaintiffs Shanks, Johnson, McManus, Greising, Davis and Roberts were intended to benefit directly from the improvement to the water system in the Town of Alma." In their briefs to us they argue that they may maintain their suit for negligence and as third-party beneficiaries at the same time to recover for their economic loss. We hold that the economic loss rule applies here to prohibit their duplicate claims under tort and contract theories.

13. Petitioners' amended complaint stated that "AZCO's negligence has caused the town's water system to leak in at least eight (8) locations thus far" and Petitioners asked for judgment for "the cost to repair or replace each and every water service line connection installed or repaired by AZCO."

which the law of contracts provides the sole remedy.")

Petitioners argue that applying the economic loss rule to bar its negligence claim would be inconsistent with our prior cases. Petitioners rely primarily on a trilogy of cases where we allowed a negligence action to proceed despite the existence of a contractual relationship between the parties. *Lembke Plumbing and Heating v. Hayutin,* 148 Colo. 334, 366 P.2d 673 (1961); *Metropolitan Gas Repair Serv., Inc. v. Kulik,* 621 P.2d 313 (Colo.1980); *Cosmopolitan Homes, Inc. v. Weller,* 663 P.2d 1041 (Colo.1983). Upon review, we conclude that the economic loss rule we formulate today does not conflict with our earlier cases because in each of these cases the negligence claims arose from the breach of duties which were independent of the contract.

Specifically, in *Lembke,* 148 Colo. 334, 366 P.2d 673, we considered whether homeowners could bring a negligence action against Lembke Plumbing and Heating ("Lembke") for negligently installing plumbing pipes resulting in damage to the house. Lembke and the homeowners entered into a written contract whereby Lembke agreed to install plumbing in the new house. *See id.* at 674. The homeowners alleged two negligence claims: first, that Lembke's employee failed to install a casing or bushing around a pipe that resulted in a severed pipeline, and, second, during a repair job to a heater, that Lembke's employee stepped on and crushed a copper gauge tube, causing water to accumulate in a pit. *See id.* at 675. The homeowners alleged that water escaped from pipelines and saturated the clay formation beneath the house causing the home to be dislocated and extensively damaged. *See id.*

Lembke argued that the contract provided the exclusive remedy its terms indicated that it "lawfully expires one year from date"and therefore the negligence actions were barred. *Id.* at 337, 366 P.2d at 675. We rejected Lembke's argument and allowed the negligence action to proceed. We observed that "[t]he contract here imposes no duty on Lembke to exercise due care and caution and the necessary degree of skill involved in a plumbing installation...." *Id.* Because the contract did not address the defendant's duty of care, we found that the independent common law duty was not limited.

In contrast, the contract in this case specifically imposes a duty of care concerning AZCO's skill and workmanship in installing the water system.[14] This duty provides the basis for a cause of action by the town and the individual landowners under contract law. Therefore, unlike in *Lembke,* no common law duty of care independent of the contract exists here.

In *Metropolitan,* 621 P.2d 313, the plaintiffs brought a negligence action against Metropolitan Gas Repair Service ("Metropolitan"), among others, for damages resulting from the explosion of a gas operated boiler that furnished hot water heat to the house. The plaintiffs alleged that the negligence of the defendants consisted of the failure to inspect a safety system and to discover a plugged or obstructed safety relief valve during repair work at the house. *See id.* at 315–16. As a result of the obstructed safety valve, pressure in the boiler was not released and the boiler exploded causing extensive destruction of the house. *See id.* at 316. The plaintiffs argued that even though Metropolitan's repairman had not worked directly on the safety valve, an independent duty of care existed requiring the repairman to inspect the safety valve during the repair. *See id.* We agreed and held that Metropolitan may have breached a duty independent of the contract when it failed to inspect the safety valve. *See id.* at 318. In reaching our holding, we stated, "The contractual obligation is not the touchstone of civil liability in tort. It is only the matrix from which an independent obligation may arise." *Id.* at 317. We permitted the negligence action because we found that the repairman, working under a contract requiring him to replace a pump motor, had a duty of care independent of the contract to also inspect the safety valve on the boiler. *See id.*

Finally, in *Cosmopolitan Homes,* 663 P.2d 1041, we considered whether subsequent purchasers of a home could assert a negligence

14. *See supra,* Section II(E) at 19–20.

claim for property damage allegedly caused by the negligence of the builder. The plaintiffs were the fourth owners of a house designed, built, and sold by Cosmopolitan Homes, Inc. *See id.* The house sustained cracking in the foundation as a result of movement or settling of the house which had not occurred prior to the time the plaintiffs purchased the house. *See id.* Relying heavily on policy concerns about protecting home buyers, we held that the plaintiffs could maintain a negligence action for latent defects in the home. *See id.* at 1045. We allowed the negligence claim for latent defects in the home because we determined that a builder has an independent duty to act without negligence in the construction of a home. *See id.* at 1042.

Accordingly, as we determine that Petitioners' negligence claim is based solely on the breach of a contractual duty resulting in purely economic loss, and thus is barred by application of the economic loss rule, we conclude that the trial court properly dismissed Petitioners' negligence claim.

### F. Attorney's Fees

Petitioners contend that the court of appeals erred in reversing the trial court's order denying attorney's fees to AZCO. Despite the existence of a contractual provision providing that the prevailing party in any litigation shall be entitled to an award of their legal expenses, Petitioners argue that because it never appropriated money for such fees, any award is barred by section 29–1–110, 9 C.R.S. (1999). We disagree.

The contract entered into between Petitioners and AZCO contained the following provision in section 3.26.1 of the "special conditions" of the contract:

> If any litigation results from any claims, disputes or other matters in question arising out of or relating to this agreement, or the breach thereof, the successful party in

the litigation shall be entitled to reasonable legal expenses as part of any judgment.

Based on this provision, AZCO moved for an award of attorney's fees after prevailing on the breach of contract claim at trial. The trial court denied the request on three independent bases. However, only the appropriations issue was raised in the petition for certiorari. The court of appeals reversed the trial court's order, finding that section 24–9–103.6, 7 C.R.S. (1999) barred Petitioners from relying on section 29–1–110 as a defense to an award of attorney's fees.

Section 29–1–110(1) prohibits municipalities from spending money in excess of the amounts appropriated by budget.[15] The prohibition on spending funds in excess of amounts appropriated by budget is not absolute. Section 24–91–103.6(4) contains the following exception for certain claims between a public entity and a contractor:

> In the event that a good faith dispute arises between a public entity and a contractor concerning the contractor's right to receive additional compensation under a remedy-granting provision of the public works contract, *it shall not be a defense to a civil action for payment to such claim that no moneys have been appropriated for such claimed amounts,* so long as the contractor has complied with all provisions of the contract applicable to the dispute.... As used in this subsection (4), "remedy-granting provision" means any contract clause which permits additional compensation in the event that a specific contingency or event occurs....

(Emphasis added.)

Petitioners argue that this section does not apply because AZCO's post-trial motion for attorney's fees does not qualify as a "civil action" within the meaning of the statute. A court's primary task in construing a statute is to ascertain and give effect to the intent of the General Assembly. *See Van Waters & Rogers, Inc. v. Keelan,* 840 P.2d

---

**15.** Section 29–1–110(1) provides:

During the fiscal year, no officer, employee, or other spending agency shall expend or contract to expend any money, or incur any liability, or enter into any contract which, by its terms, involves the expenditure of money in excess of the amounts appropriated. Any contract, verbal or written, made in violation of this section shall be void, and no moneys belonging to a local government shall be paid on such contract.

1070, 1076 (Colo.1992). Petitioners' argument rests on an unduly restrictive interpretation of the general term "civil action" and is inconsistent with the legislature's general intent as expressed in the statute. The General Assembly included the following statement in the "legislative declaration" to the statute:

> The general assembly hereby further finds and declares ... that public construction projects are subject to public appropriation laws which may be in direct conflict with commonly used construction contract clauses ... and that there is a substantial statewide interest in ensuring that the policy underlying the efficient expenditure of public moneys is balanced with the policy of fostering a healthy and viable construction industry.

§ 24–91–101(2). In light of the General Assembly's legislative declaration, it is evident that the term "civil action," as used in section 24–91–103.6(4), was not intended to be a restrictive limitation. AZCO moved for an award of attorney's fees under a remedy-granting provision of the contract and complied with all applicable requirements.[16] Therefore, we conclude that section 29–1–110 does not prohibit the trial court from awarding attorney's fees against Petitioners.[17]

### III. CONCLUSION

In sum, we hold that the economic loss rule bars Petitioners' negligence claim against AZCO. In addition, we conclude that section 29–1–110 does not prohibit an award of attorney's fees against Petitioners. Therefore, we affirm the judgment of the court of appeals and remand for further proceedings consistent with this opinion.

---

16. Petitioners do not argue that any other provision of section 24–91–103.6(4) prevents an award of attorney's fees in this case.

17. We note that we do not reach the issue of whether such fees are appropriate in this case. As the court of appeals correctly observed, the trial court did not hold a hearing on AZCO's motion; therefore, on remand the trial court must hold a hearing to determine whether an award is appropriate and, if so, the proper amount of the award.