**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 6, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

STANDARD BANK, PLC,

      Plaintiff - Appellant,

v.

RUNGE, INC., f/k/a Runge Mining, Inc.,
d/b/a Pincock, Allen & Holt,

      Defendant - Appellee.

No. 10-1045
(D.C. No. 1:07-CV-01989-RPM)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, Chief Circuit Judge, **HOLLOWAY**, and **O'BRIEN**, Circuit Judges.

Standard Bank, PLC appeals from the district court's grant of summary judgment in favor of engineering firm Runge, Inc., d.b.a. Pincock, Allen & Holt (PAH). Standard filed tort claims against PAH for preparing an allegedly flawed viability report in connection with Standard's financing of a coal mine that went bankrupt. The district court concluded the claims were barred by the economic loss rule. We affirm.

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1. It is appropriate as it relates to law of the case, issue preclusion and claim preclusion. Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A). Citation to an order and judgment must be accompanied by an appropriate parenthetical notation – (unpublished). *Id.*

## BACKGROUND

In 2005, Bronco Hazleton, Co., a wholly owned subsidiary of Bronco Energy Fund, Inc. (Bronco) entered into a contract to purchase the Hazleton coal mine in Indiana for $25 million. Royal Bank of Scotland (RBS), which was to provide the financing for the deal, required an evaluation by an independent engineer as part of its due diligence. To that end, RBS contacted PAH and instructed it to deal directly with Bronco. When Bronco retained PAH as the independent engineer, it made an immediate payment of $35,000 to be credited toward PAH's fees.

The contract[1] between Bronco and PAH required PAH to perform its work at Hazleton "in accordance with the standard of care of its profession, which means generally accepted professional practices, in the same or similar localities, related to the nature of the work accomplished, at the time the services are performed." (R. Vol. 6 at 1188.) It limited PAH's total liability to the greater of the amount of fees paid under the contract or $50,000 but offered the possibility of increased exposure to liability in exchange for a higher fee. The contract explicitly said no third party beneficiaries were intended and required each party to obtain written permission from the other before disclosing the contents of the report to outsiders. PAH presented a preliminary report to Bronco in August 2005. [Vol. 1 at 32] Included in the report was pointed language saying Bronco had retained PAH and "PAH has prepared this report for use by RBS as RBS

---

[1] There was no signed contract between Bronco and PAH. The district court concluded PAH's written proposal to provide services became the contract when Bronco made payment for PAH's services. The parties do not argue otherwise. When we refer to the contract, we are referring to PAH's proposal.

evaluates the merits of the Hazelton venture." (R. Vol. 1 at 37).

RBS pulled out of the deal on September 26, 2005, the day before closing. A few days later, an independent broker mentioned the deal to Standard, which stepped in to provide financing. Internal documents show Standard was projecting a 69% internal rate of return on the transaction. Standard, like RBS, required a report from an independent engineer. RBS "release[d]" the contractors it had used to perform the due diligence, including PAH, to Standard. (R. Vol. 7 at 1513.) In November 2005, PAH submitted a report nearly identical to the one provided to RBS. It was "[p]repared for Standard" and the recitals were amended to read, "PAH, in its role as IE [independent engineer], intends that this report will be used by Standard as Standard evaluates the merits of the Hazelton venture." (R. Vol. 1 at 98, 103.) The total amount of the loan was $35 million. The transaction closed in December 2005 and PAH's outstanding fees were paid out of the funds Standard loaned to Bronco, but listed under "Lender Transaction Expenses." (R. Vol. 7 at 1461.)

In January 2006, Standard started the process of syndicating the loan. In connection with its plan to market the project to other banks, it asked PAH to change the recitals in its report. Standard wanted the language saying Bronco had retained PAH to be replaced by language less likely to cause other banks to be concerned about PAH's independence. PAH complied. Its new report contained no reference to Bronco having retained it; instead it simply said PAH had been retained as an independent engineer to perform work on behalf of Standard and other potential lenders evaluating the mine. Standard was unable to syndicate the loan because the mine soon failed and Bronco

declared bankruptcy in May 2006, less than six months after the purchase.

By March 2006 serious problems with the mine became evident. Standard alleges the problems should have been, but were not, flagged in PAH's report.[2] Standard retained another engineering firm to reevaluate the mine (that firm, incidentally, limited its liability to Standard to the amount of its fee). Standard attempted to rescue the mine by providing Bronco with debtor-in-possession financing. The efforts were unsuccessful.

In September 2007, Standard sued PAH for negligent misrepresentation and professional negligence. The parties later filed cross-motions for summary judgment. Concluding the economic loss rule barred Standard's claims, the district court entered summary judgment in favor of PAH.

## DISCUSSION

"We review a grant of summary judgment de novo." *Grantham v. Ohio Cas. Co.*, 97 F.3d 434, 435 (10th Cir. 1996) (citation omitted). Whether Colorado's economic loss rule applies to bar a claim is a question of law also subject to de novo review.[3] *Level 3 Commc'ns, LLC. v. Liebert Corp.*, 535 F.3d 1146, 1162 (10th Cir. 2008).

The Colorado Supreme Court adopted the economic loss rule in *Town of Alma v.*

---

[2] Standard claims PAH miscalculated the mine's reserves of Clean Air Act compliant coal, overstating the amount by one hundred percent. Bronco quickly discovered it could not extract enough compliant coal to satisfy its obligations under existing contracts. Standard also claims PAH failed to disclose that its geologist had discovered a number of partings (layers of rock in the coal seam) rendering portions of the mine unworkable. According to Standard, the report also overstated the mine's coal-preparation ability and neglected to account for royalties required to be paid on all coal sales. PAH disagrees with the substance and legal effect of Standard's allegations. Those quarrels do not impact the narrow issue before us.

[3] Both parties agree that Colorado law applies in this diversity action.

- 4 -

*AZCO Construction,* 10 P.3d 1256, 1264 (Colo. 2000). "[A] party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Id.* "The scope of this rule includes third-party contract beneficiaries who may have a cause of action for breach of contractual duties." *Id*. at n.12. The application of the rule focuses on the source of the duty alleged to have been breached. *Id.* at 1263.

In *Town of Alma*, the town and several individuals sued AZCO for shoddy workmanship on the town's water distribution system. *Id.* at 1258. Appearing to depart from an earlier trend in its case law, the Colorado Supreme Court decided the economic loss rule barred the plaintiffs' tort claims. *Id.* at 1264-65. The court concluded the claims were based on the duties stated in the construction contract and not on an independent tort duty. *Id.* at 1264. As it was the first case to apply the economic loss rule, the court felt the need to reconcile its earlier, seemingly inconsistent, cases, which did not discuss (or even mention) the rule. It distinguished the cases on the following bases: (1) the common law duty underlying the tort in one case was not limited where the contract did not address the duty of care (the standard of workmanship); (2) the duty underlying the tort in another was entirely separate from the duty created by the contract between the parties, and (3) in the third case policy concerns required finding a builder had an independent duty to act without negligence in constructing a residence.[4] *Id.* at

---

[4] These cases also all involved private homeowners. Colorado apparently applies the independent duty rule differently in residential construction cases, i.e., it allows negligence claims by private homeowners against subcontractors despite the fact the

1265-66.

Four years later, the Colorado Supreme Court expanded the application of the rule in commercial cases. *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66 (Colo. 2004). Dufficy, a subcontractor on a municipal construction project, attempted to sue the project's engineer (BRW) and its inspector for negligence and negligent misrepresentation.[5] *Id.* at 67. Dufficy claimed it incurred additional costs due to BRW's faulty plans and the inspecting entity's failure to timely inspect the project and its misrepresentations concerning another subcontractor's work. *Id.* at 70. The court applied the economic loss rule even though there was no contract between Dufficy and BRW or the inspector. *Id.* at 72. It extended the rule, saying it "applies when the claimant seeks to remedy only an economic loss that arises from interrelated contracts." *Id.* It also rejected the notion that "a licensed engineer owes an independent duty of care under tort law to the contractors and subcontractors with respect to the plans and specifications drafted and prepared by the engineer and relied upon by the contractor or subcontractor."[6] *Id.* at 71. If there was a duty in tort, it was not sufficiently independent

claims were based on duties set forth in contracts between the subcontractors and prime contractors. *See infra* n.7.

[5] Standard pled professional malpractice in addition to a negligent misrepresentation claim of the type considered in *BRW*. It is not clear whether a professional malpractice claim against an engineer can be brought by a third party non-client in Colorado or whether malpractice should be dealt with differently from other tort claims under the economic loss rule. However, the parties have not attempted to draw a distinction between the two claims on appeal so we will not consider the malpractice claim separately. *See Kokins v. Teleflex, Inc.*, 621 F.3d 1290, 1302 n.6 (10th Cir. 2010) (arguments not raised on appeal are deemed to be waived).

[6] There is some tension in the line of Colorado cases applying the economic loss

of the contract to preclude application of the economic loss rule.

The court reasoned the economic loss rule barred Dufficy's claims because:

> [The case] involve[d] contractual duties that arose out of a network of agreements of which all parties had notice. The [p]roject involved commercially sophisticated parties able to negotiate and bargain for an allocation of risks, duties, and remedies. Dufficy was aware that it would be bound by BRW's plans and specification before it entered into a contract [with another subcontractor]. Dufficy had the opportunity to allocate the risks that might occur in following BRW's plans and relying on [the inspector's] inspection of the [p]roject, but failed to do so. Rather, when Dufficy contracted with [another subcontractor], it agreed to be bound by BRW's plans and specifications and did not obtain provisions protecting itself from economic loss.

*Id.* at 73.

To determine if the economic loss rule bars recovery in tort in this case, we first

---

rule. In *A.C. Excavating v. Yacht Club II Homeowners Association, Inc.*, the yacht club homeowners sued subcontractors who worked on their homes for negligent construction. 114 P.3d 862 (Colo. 2005). The subcontractors had contracted with the general contractor and developer, but not with the homeowner's association or its members. The court held "the economic loss rule has no application to negligent residential construction claims against subcontractors because subcontractors owe homeowners an independent duty of care to act without negligence in the construction of homes." *A.C. Excavating*, 114 P.3d at 870. The court appears to have concluded the existence of an independent tort duty was enough to render the economic loss rule inapplicable, *id.* at 866, even though the standard of care was laid out in the contracts between the subcontractors and the general contractor and developer. *Id.* at 873 (Kourlis, J., dissenting). The court mentioned *BRW*, but did not discuss the case in depth or resolve the tension created by its decision. *Id.* at 865-66.

We are left to identify and apply distinguishing principles. The economic loss rule, as articulated in *BRW*, "applies between and among commercial parties," 99 P.3d at 72, and Colorado courts apparently provide heightened protection for private consumers, particularly in the context of residential construction.

This case is analogous to *BRW*, not *A.C. Excavating*; it involves sophisticated commercial entities and presents none of the concerns present in the residential construction cases cited by Standard.

turn to whether the duties between these commercial parties were governed by a set of "interrelated contracts." *Id*. at 72. Standard argues *BRW* does not apply here for several reasons. First, Standard would have us limit the "interrelated contracts" analysis in *BRW* to construction cases. The language in *BRW*, however, indicates a broader reach was intended. It refers consistently to "commercial parties" and the distinction between commercial and consumer transactions is logical, given the purposes and history of the economic loss rule in Colorado. *Id.* at 72 ("The economic loss rule applies between and among commercial parties for three main policy reasons, none of which depends upon or is limited to the existence of a two-party contract: (1) to maintain a distinction between contract and tort law; (2) to enforce expectancy interests of the parties so that they can reliably allocate risks and costs during their bargaining; and (3) to encourage the parties to build cost considerations into the contract because they will not be able to recover economic damages in tort.").

Standard also claims the contracts here were not interrelated because they were not negotiated or agreed to contemporaneously and therefore it had no opportunity to bargain in advance of PAH's work. In *BRW*, "BRW completed the drawings and specifications" before the City invited bids for the general contractor. *Id*. at 68. The general contractor then contracted with a subcontractor, who contracted with Dufficy. The opinion does not say how long it took for the series of contracts to be negotiated, but clearly the design work was completed before Dufficy's contract, just as PAH's work was completed before

Standard entered the picture. [7]

Additionally, Standard argues PAH had an independent duty as an "evaluative professional" to provide "an accurate evaluation to all intended recipients of its report." (Appellant's Opening Br. at 42.)

> [Colorado has] recognized that some special relationships by their nature automatically trigger an independent duty of care that supports a tort action even when the parties have entered into a contractual relationship. *See, e.g., Bebo Constr. Co. v. Mattox & O'Brien, P.C.*, 990 P.2d 78, 83 (Colo. 1999) (attorney-client relationship creates independent duty of care); *Greenberg v. Perkins*, 845 P.2d 530, 534 (Colo. 1993) (physician-patient relationship creates independent duty of care, as does physician's independent medical examination of non-patient); *Farmers Group, Inc. v. Trimble*, 691 P.2d 1138, 1141-42 (Colo. 1984) (quasi-fiduciary nature of insurer-insured relationship creates independent duty of care).

*Town of Alma*, 10 P.3d at 1263.

However, in *BRW*, the Colorado Supreme Court was reviewing an appellate court's conclusion that engineers and its inspectors owe an independent duty sufficient to preclude application of the economic loss rule to parties relying on their work. It reversed the appellate court. In doing so, the supreme court identified three factors for

---

[7] In *Level 3 Communications, LLC*, Level 3 purchased electrical backup systems and batteries for the systems from Liebert. 535 F.3d at 1151-52. When permanent batteries were delayed by the manufacturer (not Liebert), Liebert agreed to provide temporary batteries for the systems. *Id.* at 1149, 1151-52. The batteries, which Level 3 claimed Liebert represented as new, turned out to be two years old. *Id.* at 1149. We concluded the economic loss rule did not apply because the subject of the alleged misrepresentation was outside the scope of the original contract; it involved a separate negotiation to provide temporary batteries not contemplated under the original contract. *Liebert*, 535 F.3d at 1163 ("the sale of the [temporary] batteries laid outside [the contract's] scope, and the parties were merely negotiating a new contract rather than operating under the existing one"). Here, the alleged misrepresentation was made in the course of the evaluation required by the very contracts at issue. The conduct clearly falls within the scope of the contracts.

determining the source of the duty at issue: "(1) whether the relief sought in negligence is the same as the contractual relief; (2) whether there is a recognized common law duty of care in negligence; and (3) whether the negligence duty differs in any way from the contractual duty." *BRW, Inc.*, 99 P.3d. at 74. It clearly identified the tipping point, "[i]f we conclude that the duty of care owed by BRW [and the inspector] was memorialized in the contracts, it follows that the plaintiff has not shown any duty independent of the interrelated contracts and the economic loss rule bars the tort claim and holds the parties to the contracts' terms." *Id.* It decided Dufficy's claims of negligence and negligent misrepresentation against BRW and the inspector were barred by the economic loss rule because the contract between BRW and the city and the contract between BRW and the inspector set forth the duties BRW and the inspector allegedly breached. *Id.* at 74-75. That is also the case here. Standard is alleging PAH breached the very duty of care set forth in the Bronco/PAH contract -- the duty to provide professionally competent services in its evaluation of the mine.[8]

The relationships here were governed by a set of interrelated contracts between sophisticated commercial entities, all of which had the opportunity to allocate risk and loss through negotiation of their separate contracts. The Senior Credit Agreement between Bronco and Standard references the "Independent Engineer's Report" and sets forth requirements for its contents in order for the transaction to go forward. (R. Vol. 2 at 210). When it drafted and executed the Senior Credit Agreement, Standard knew it

---

[8] The contract not only set forth the duty, it also expressly limited PAH's liability for any breach of that duty to the amount of its fees.

would be relying on the PAH report in its process of approving the deal.

When Standard took over the deal, RBS sent it a "release" of all consultants, including PAH, but "ma[d]e no representation or warranty as to any of the[] consultants and legal advisors or any of the reports and other documents they ha[d] prepared" and disclaimed "any and all liability to you resulting from your use of these consultants and legal advisors or your use of any of those reports and other documents." (R. Vol. 7 at 1513). Yet, even after RBS disclaimed liability, Standard made no effort to ensure it had protections in place from another source.

The *BRW* court noted, "[e]ven though a subcontractor may not have the opportunity to directly negotiate with the engineer or architect, it has the opportunity to allocate the risks of following specified design plans when it enters into a contract with a party involved in the network of contracts." 99 P.3d at 72. There is no reason Standard could not have taken action to allocate the risk of any inaccuracies in the report. It could have, for example, required Bronco to pay PAH to increase its liability exposure, contracted with PAH directly for its services and requested it to add Standard as a named insured on its professional liability insurance coverage for the transaction, or sought an opinion from another engineer who was willing to bargain on liability issues. Standard argues it was never given the contract between Bronco and PAH, but nothing suggests Standard ever requested to see the contract. It is simply trying to skirt liability for its lack of diligence.[9] It is also undisputed that Standard was generally familiar with these types

_____

[9] Standard's focus on a possible 69% internal rate of return may have caused it to

- 11 -

of contracts and their terms.

Finally, Standard argues the economic loss rule should not apply because in this case, it would deprive a plaintiff who has no remedy in contract from asserting a tort.[10] However, that is precisely what happened in *BRW* - the subcontractor was left with no claim against the engineer or inspector in contract or tort – its only remedy was against

let down its guard. Its internal reports note the risk of proceeding at the pace required by its late takeover of the financing:

> [W]e have some degree of discomfort with respect to the speed at which we have had to put this deal together. Although we have sought to cover all the avenues, realistically in the time available we have some concern that certain aspects may not have received the typical level of scrutiny. This fact combined with the fact that there is little additional liquidity to address such errors is a real risk in this transaction. . . . [T]he risk profile is reflected in the return . . . .

(R. Vol. 7 at 1420.) It ultimately decided to proceed, despite the possibility some contingencies might be left unaddressed, because of the "highly remunerative" nature of the transaction. (*Id.* at 1421.)

[10] Standard claims it has no contract remedy available because the contractual relationship between PAH and Bronco did not extend to it through novation or a third-party beneficiary theory nor was there an implied contract between it and PAH. On the other hand, PAH argues Standard's remedy, if any, is to recover its losses on one of those theories and Standard would be limited to contract damages – the fees paid to PAH, approximately $95,000. The district court did not address this issue because it found the claims were barred entirely. Because the economic loss rule bars Standard's claims, we need not address it either.

Standard requests permission to amend its complaint to include contract claims if we find the tort claims are barred. We "ha[ve] repeatedly and unequivocally held that, once judgment is entered, the filing of an amended complaint is not permissible until judgment is set aside or vacated . . . ." *The Tool Box, Inc. v. Ogden City Corp.*, 419 F.3d 1084, 1087 (10th Cir. 2005) (quotations omitted). "The fact that a party desiring to amend after judgment has been entered is obliged first to obtain relief from the judgment imposes some important restrictions on the ability to employ Rule 15(a) [of the Federal Rules of Civil Procedure, which governs amendment of complaints]." *Id.* (quotations omitted). Because we affirm the judgment of the district court, Standard's request to amend is denied.

the city. *BRW* makes it clear the Colorado courts do allow the economic loss rule to deprive a sophisticated commercial plaintiff of its only remedy against a particular defendant. One of the purposes of the rule announced by the Colorado Supreme Court is "to encourage the parties to build the cost considerations into the contract **because they will not be able to recover economic damages in tort**." *Id.* at 72 (emphasis added). Standard is left with no contract remedy because it failed to bargain for such a remedy when it had the opportunity. A party who fails to protect itself in a contract may be left without any remedy at all as a result of its oversight. The district court properly determined the economic loss rule bars Standard's recovery.

**AFFIRMED**. Standard's request for a remand with directions to permit it to amend its complaint is **DENIED**.

                                  **Entered by the Court:**

                                  **Terrence L. O'Brien**
                                  United States Circuit Judge