2013 COA 145

**IN RE the ESTATE OF Carol S. GATTIS, deceased.**

**Scott M. Gattis, Linda L. Spreitzer, and Amy G. Goeden, as Personal Representatives, Appellees,**

v.

**John E. McNutt; Timothy A. McNutt; and Christopher L. Boortz, Defendants–Appellants.**

**Court of Appeals Nos. 12CA1269 & 13CA0116**

Colorado Court of Appeals, Div. IV.

Announced November 7, 2013

Hasler, Fonfara and Goddard LLP, Timothy L. Goddard, Fort Collins, Colorado; Swift and Bramer, LLP, James D. Bramer, Windsor, Colorado, for Appellees

Moye White LLP, William F. Jones, Dean E. Richardson, Denver, Colorado, for Defendants–Appellants

Opinion by JUDGE WEBB

¶ 1 Whether the economic loss rule bars a nondisclosure tort claim against the seller of a home built on expansive soils, which caused damage to the home after the sale, is a question of first impression in Colorado. In case number 12CA1269, defendants, John E. McNutt, Timothy A. McNutt, and Christopher L. Boortz (collectively, Sellers), appeal the judgment entered following a bench trial in favor of Carol S. Gattis (Gattis) on her nondisclosure claim. They seek reversal on the basis that the economic loss rule precludes Gattis's tort claim because the standard-form purchase and sale agreement included a "Seller's Property Disclosure" form (SPD), which addressed expansive soils, but Gattis did not assert a breach of contract claim.

¶ 2 We decline to apply the economic loss rule in this case for two reasons. First, apart from any contractual obligation, home sellers owe home buyers an independent duty to disclose latent defects of which they are aware. Second, disclosure provisions in the standard-form residential real estate contract at issue do not so subsume this independent duty as to trigger the economic loss rule. Therefore, we affirm the trial court's judgment.

## I. Background

¶ 3 An entity controlled by Sellers purchased the residence for purposes of repair and resale. Before the purchase, this entity obtained engineering reports that included

extensive discussion of structural problems in the residence resulting from expansive soils and of ways to remedy those problems. Advance Structural Repair, another entity that Sellers controlled, oversaw the repair work. When the repairs were completed, Sellers obtained title to the residence and listed it for sale.

¶ 4 Sellers had no direct contact with Gattis and her husband, both now deceased, who purchased the residence from them. The parties entered into a standard-form real estate contract, approved by the Colorado Real Estate Commission: Contract to Buy and Sell Real Estate (Residential) (New Loan) (CBS 1–10–11), to which they made no changes (the Form Contract).

¶ 5 As relevant here, the SPD asked, "To Seller's current actual knowledge, do any of the following conditions now exist or have they ever existed: sliding, settling, upheaval, movement or instability of earth or expansive soils on the Property?" Across this entire page, one of the Sellers wrote, "Seller has no personal knowledge of property / Seller has never lived at property." The SPD also asked, "To Seller's current actual knowledge, do any of the following conditions now exist or have they ever existed: structural problems?" Although one of the Sellers wrote the same statement across this page, the "Yes" box was checked in response to this question, followed by, "Repaired by Advanced Structural Repair—Engineered by Bob Hessick" (sic).

¶ 6 Several years after having taken title to the residence, Gattis commenced this action. She pleaded several tort claims alleging only economic losses based on damage to the residence resulting from expansive soils.

¶ 7 The trial court denied Sellers' pretrial motion for summary judgment based on the economic loss rule. Sellers raised the economic loss rule through an oral motion to dismiss at the end of Gattis's case-in-chief. Again, the court denied Sellers' motion.

¶ 8 Sellers do not dispute the trial court's findings that before the sale closed:

- No reference was made to " 'expansive soil' in any manner, in any discussion or disclosure to the Gattises or any of their representatives."
- "No person or entity ever informed the Gattises or any of their representatives that the individual Sellers were the principals of Advanced Structural Repair."
- "Neither the Gattises nor their representatives were made aware of the various Engineering Reports ... that had been reviewed by the Sellers when they were debating whether to purchase the residence."

¶ 9 As relevant here, the trial court held Sellers liable for nondisclosure of material facts. Citing Colorado Jury Instructions (CJI)-Civil 19:2 (2009), the court explained:

Defendants falsely represented in the [SPD] that they had no personal knowledge of the property, when in fact they were thoroughly familiar with it. They also failed to disclose that they were the principals of Advance Structural Repair. Finally, and most importantly, they failed to disclose that expansive soil underlies the Residence and had already caused serious structural damage to the Residence. Indeed, the [SPD] actively concealed the existence of the expansive soil because it stated ... that to Seller's current actual knowledge, expansive soil had never existed, and did not now exist, on the property.

## II. The Economic Loss Rule Does Not Bar Gattis's Nondisclosure Tort Claim

### A. Standard of Review

¶ 10 "Whether the economic loss rule precludes a particular claim raises a legal issue subject to de novo appellate review." *Makoto USA, Inc. v. Russell*, 250 P.3d 625, 627 (Colo.App.2009). "The existence and scope of a tort duty is a question of law to be determined by the court." *A.C. Excavating v. Yacht Club II Homeowners Ass'n, Inc.*, 114 P.3d 862, 866 (Colo.2005).

### B. Economic Loss Rule

¶ 11 Under the economic loss rule, "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Town of Alma v. AZCO*

*Constr., Inc.*, 10 P.3d 1256, 1264 (Colo.2000). In adopting the rule, the supreme court recognized three policy considerations:

> (1) to maintain a distinction between contract and tort law; (2) to enforce expectancy interests of the parties so that they can reliably allocate risks and costs during their bargaining; and (3) to encourage the parties to build the cost considerations into the contract because they will not be able to recover economic damages in tort.

*BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 72 (Colo.2004).

¶ 12 The source of the underlying duty determines whether the economic loss rule applies. *Town of Alma*, 10 P.3d at 1262. While contractual obligations are based on bargained-for exchanges, tort law imposes general duties "to protect citizens from risk of physical harm or damage to their personal property," in addition to duties arising from any agreement or contract. *BRW, Inc.*, 99 P.3d at 72 (quoting *Town of Alma*, 10 P.3d at 1262).

¶ 13 For a claim to escape the economic loss rule, the duty must arise independently of any contractual obligation. *Town of Alma*, 10 P.3d at 1263 (citing *Brody v. Bock*, 897 P.2d 769, 776 (Colo.1995) (common law fraud claim is based on violation of a duty independent of contract); *Keller v. A.O. Smith Harvestore Prods., Inc.*, 819 P.2d 69, 73 (Colo.1991) (negligent misrepresentation is a tort claim based "not on principles of contractual obligation but on principles of duty and reasonable conduct")); *see also United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1227 (10th Cir. 2000) (plaintiff's "fraud claim, although premised on representations made in the course of contractual negotiations, likewise arose independently of the contract") (applying Colorado law).

### C. Analysis

#### 1. Independent of Any Contractual Obligation, Sellers Owe Home Buyers a Duty to Disclose Known But Latent Defects

¶ 14 The economic loss rule does not bar negligence claims brought by home-

owners against builders for latent construction defects, because the "builder has an independent duty to act without negligence in the construction of a home." *Town of Alma*, 10 P.3d at 1265–66.[1] In so holding, the court "[r]el[ied] heavily on policy concerns about protecting home buyers." *Id.* at 1266. Despite more recently having applied the economic loss rule in commercial construction cases, the supreme court has declined to extend it to negligence claims for latent defects in residential construction. *Compare BRW, Inc.*, 99 P.3d at 74, *with A.C. Excavating*, 114 P.3d at 866.

¶ 15 In *Mid Valley Real Estate Solutions V, LLC v. Hepworth–Pawlak Geotechnical, Inc.*, 2013 COA 119, ⸺ P.3d ⸺, 2013 WL 3943215, a negligent construction case involving a residence, the division identified several policy considerations that favor recognizing an independent duty to protect homeowners:

- Preventing "overreaching" by a builder, which is "comparatively more knowledgeable" and "is in a far better position to determine the structural condition of a house than most buyers," [*Cosmopolitan Homes, Inc. v. Weller*, 663 P.2d 1041, 1045 (Colo.1983) (quotations omitted)];

- An "ordinary purchaser of a home is not qualified to determine when or where a defect exists," *id.* (quotations omitted);

- A purchaser of a home "rarely has access to make any inspection of the underlying structural work, as distinguished from the merely cosmetic features," *id.* (quotations omitted);

- The magnitude of the investment made when purchasing a home, *id.*;

- The foreseeability that a house will be sold to someone who is not the original owner, *id.*;

- The foreseeability that a construction professional's work on a house "is, ultimately, for the benefit of homeowners and that harm to homeowners from negligent construction is foreseeable," *Yacht Club II Homeowners Ass'n v. A.C. Exca-*

---

1. This duty now includes residential subcontrac-   tors. *A.C. Excavating*, 114 P.3d at 867–68.

*vating,* 94 P.3d 1177, 1181 (Colo.App. 2003), *aff'd,* 114 P.3d 862 (Colo.2005); and

- An independent duty "discourage[s] misconduct and provide[s] an incentive for avoiding preventable harm," *id.*

*Mid Valley,* ¶ 13.

¶ 16 For the following reasons, we conclude that these policy considerations apply to home sellers and home buyers as well. And we further conclude that they preclude drawing a principled distinction between negligence claims against home builders for latent defects in the original construction, which are outside the economic loss rule, and a nondisclosure claim against a later home seller for latent defects known to the seller.

- While both home builders and later sellers are parties to contracts, "contractual obligation is not the touchstone of civil liability in tort. It is only the matrix from which an independent tort obligation may arise." *Metro. Gas Repair Serv., Inc. v. Kulik,* 621 P.2d 313, 317 (Colo.1980), *quoted with approval in A.C. Excavating,* 114 P.3d at 867. Thus, "[t]he fact that a contract may have existed between a builder and the original purchaser of the home does not transform the builder's contractual obligation into the measure of its tort liability arising out of its contractual performance." *Cosmopolitan Homes, Inc.,* 663 P.2d at 1043.

- Like home builders' common law duty to act with ordinary care, so too home sellers' common law duty to disclose known but latent defects in the property has long been recognized. *See, e.g., Schnell v. Gustafson,* 638 P.2d 850, 851–52 (Colo. App.1981) (holding radioactive mine tailings under home was a latent condition that the seller had a duty to disclose, even absent privity of contract). For over fifty years, Colorado has required sellers to disclose latent soil defects of which they are aware. *See Cohen v. Vivian,* 141 Colo. 443, 447, 349 P.2d 366, 367 (1960).

- Just as home builders are in a better position to know the structural condition of a home, *Cosmopolitan Homes, Inc.,* 663 P.2d at 1045, a seller who has actual knowledge of a latent defect occupies a similarly superior position. And where disparate knowledge exists, "a person has a duty to disclose to another with whom he deals facts that in equity or good conscience should be disclosed." *Burman v. Richmond Homes Ltd.,* 821 P.2d 913, 918 (Colo.App.1991).

- In contrast, original homeowners and later buyers have similar difficulty in learning of a latent defect. *Cf. Nielson v. Scott,* 53 P.3d 777, 780 (Colo.App.2002) (declining to protect buyer when defect should have been discovered).

- Whether victimized by a negligent home builder or a seller who remains silent despite knowledge of a latent defect, "[t]he purchaser can ill afford to suddenly find a latent defect in his or her home that completely destroys the family's budget and have no remedy for recourse." *Cosmopolitan Homes, Inc.,* 663 P.2d at 1045 (quoting *Simmons v. Owens,* 363 So.2d 142, 143 (Fla.Dist.Ct.App. 1978)). This is so because such a purchase is "the biggest and most important investment in [one's] life and, more times than not, on a limited budget." *Id.*

- Harm to the home—and to the homeowner—is equally foreseeable, whether caused by a latent defect arising from negligent original construction or nondisclosure of any other latent defect known to a later seller.

- Enforcing the duty of sellers to disclose known but latent defects, no less than enforcing the duty to build with ordinary care, avoids preventable harm to innocent parties and discourages misconduct. The burden to disclose latent but known defects, and thereby guard against injury to home buyers, is minor because the seller's duty to disclose known but latent defects would apply to only material defects. *See Briggs v. Am. Nat'l Prop. & Cas. Co.,* 209 P.3d 1181, 1186 (Colo.App. 2009) ("Undisclosed facts are 'material' if the consumer's decision might have been different had the truth been disclosed."). And because nondisclosure involves an intentional tort, the interest in discouraging such misconduct is even greater than in discouraging mere negligence. *See, e.g., Fisher v. Comer Plantation, Inc.,*

772 So.2d 455, 466 (Ala.2000) ("[I]t is the policy of courts . . . to discourage fraud." (citation and internal quotation marks omitted)).

¶ 17 For these reasons, we conclude that claims against home sellers for nondisclosure of latent but known defects arise from an independent duty.

2. **Disclosure Terms in the Form Contract Do Not So Subsume This Independent Duty as to Trigger the Economic Loss Rule**

¶ 18 Sellers argue that "[t]he Court need not reach the issue of whether or not Sellers owed Gattis an independent duty of care, because the only duties allegedly breached were those subsumed within the Contract and [SPD]." We disagree because, unlike the transaction-specific, negotiated contracts in the cases on which sellers rely, *see Former TCHR, LLC v. First Hand Mgmt. LLC*, 2012 COA 129, ¶¶ 28–30, 317 P.3d 1226, 2012 WL 3127336; *Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282, 292–93 (Colo. App.2009), neither the SPD nor any other term in the Form Contract limits or subsumes home sellers' common law duty to disclose latent defects of which they are aware.

¶ 19 When parties negotiate a contract for a particular transaction, they often address common law duties. *See, e.g., TCHR*, ¶¶ 28–30; *Hamon*, 229 P.3d at 292–93; *Casey v. Colo. Higher Educ. Ins. Benefits Alliance Trust*, 2012 COA 134, ¶ 30, 310 P.3d 196 ("The language in the trust agreements creating the fiduciary duty indicates that sophisticated parties negotiated this contract."). Such contracts may completely subsume the common law duties addressed. *See Casey*, ¶ 30 ("The fiduciary duty that tort law imposes on trustees generally is nearly identical to the fiduciary duty that the language of the trust agreements imposes on the trustees here.").

¶ 20 Deciding if a common law duty differs from the corresponding contractual duty turns on whether the "duty of care . . . was memorialized in the contracts." *BRW, Inc.*, 99 P.3d at 74. A court need consider only whether "the [tort] claim could not have

been proven without first proving that defendants also breached their contract with plaintiff." *Makoto USA, Inc.*, 250 P.3d at 628.

¶ 21 For example, in *TCHR*, the contract for the purchase and sale of a shopping center included "carefully and expressly drawn allocations of risks, duties, and remedies for which [the parties] bargained." *TCHR*, ¶ 30. Specifically,

the Agreement stated that [the defendant] would deliver due diligence materials to [one of the plaintiffs] within ten business days of signing the agreement. . . . In addition, in the lengthy and extremely broad "as is" clause . . . , [one of the plaintiffs] released [the defendant] from any representations regarding the property and confirmed that [the plaintiff] was relying solely on its own investigation and not in any way on any representations made by [the defendant] regarding the property.

*Id.* at ¶ 28. Relying on the holding in *Hamon* that "although there is a common law duty to refrain from fraud, any such duty existed in the case only because of the parties' contracts," the division reached the same conclusion as to the nondisclosure claim against the seller. *Id.* at ¶¶ 32–33 (citing *Hamon*, 229 P.3d at 293–94). It added that imposing the common law duty of disclosure "would allow [the plaintiff] to evade its express agreement that it would not in any way rely on any representations or information provided by [the defendant] or its representatives, *other than those set forth in the Agreement*, but rather would rely *exclusively on its own investigation*." *Id.* at ¶ 30 (emphasis added). Then it applied the economic loss rule to bar the nondisclosure claim. *Id.* at ¶ 33.

¶ 22 In *Hamon*, a contractor claimed that the defendants, who were other participants in the commercial construction project, concealed and misrepresented site conditions, causing the contractor to submit change orders and seek delay damages. 229 P.3d at 287–88. The contracts in *Hamon*, however, addressed site conditions and related problems in four ways: (1) the defendants' discretion to accept change orders; (2) the covenant of good faith and fair dealing implicit in their doing so; (3) the implied warranty of

the adequacy of the plans and specifications; and (4) the duty set forth in the contract's "prevailing standard of practice" clause. *Id.* at 292–93. The division explained that "[s]uch a duty would presumably preclude the type of concealment and misrepresentation [the plaintiff] allege[d] . . ., and the articulation of such a duty in the contract further demonstrate[d] the parties' ability to allocate the risk of such conduct in their bargaining." *Id.* at 293. The contract also included specific remedies for the harm resulting from the alleged concealment and misrepresentation. *See id.* at 292. As in *TCHR,* the division held that the economic loss rule barred the contractor's claims. *Id.* at 293–94.

¶ 23 Sellers' argument that *Hamon* and *TCHR* require application of the economic loss rule to bar Gattis's nondisclosure claim ignores the following differences between the transaction-specific agreements in those cases and the Form Contract:

- Unlike in *TCHR,* neither the Form Contract nor the SPD limits the parties' rights and liabilities to the categories of information specified in the SPD.

- Unlike in *Hamon,* the Form Contract does not set out a standard of care or incorporate one by reference. *See also Casey,* ¶ 30 ("The trust agreements explicitly spell out the trustees' duties in the section labeled 'Fiduciary Duties.' ").

- The Form Contract does not disclaim the buyer's reliance on other statements or nondisclosures that the seller may make, or represent that the buyer is relying only on the buyer's own independent investigation, as in *TCHR.* Rather, it warns the seller that "Failure to disclose a known material defect may result in legal liability."

- As discussed in section III below, the Form Contract provides only general remedies, none of which addresses the SPD, in contrast to the specific provisions concerning change orders and delay damages in *Hamon.*[2]

¶ 24 Therefore, the common law duty to disclose is not subsumed merely because the SPD asks questions about categories of commonly occurring defects. To the contrary, while Sellers were not required by the SPD to disclose their involvement with the entity that had performed repairs, the trial court found—and the Sellers do not dispute—that this fact was material and should have been disclosed. Thus, Gattis could have prevailed on this nondisclosure without relying on the SPD. *See Makoto USA, Inc.,* 250 P.3d at 628.

¶ 25 Nevertheless, Sellers argue that the SPD subsumes their common law duty to disclose latent defects of which they knew because several sections of the SPD contain numbered but blank boxes, in which additional information could be added, and because the SPD admonishes the seller that "failure to disclose a known material defect may result in legal liability." This argument fails for two reasons.

¶ 26 First, the SPD does not instruct or require the seller to include additional information in the blank boxes. Second, because the buyer's signature on the SPD acknowledges only receipt ("Buyer hereby receipts for a copy of this Disclosure."), even if the admonition could be interpreted as limiting the seller's common law duty, the buyer merely acknowledging receipt would not constitute agreement to such a limitation. Nor does the Form Contract contain any language binding the buyer to the SPD.

¶ 27 To the extent that *TCHR* and *Hamon* contain broad statements about using the economic loss rule to bar fraud claims, we decline to apply such statements in residential real estate transactions utilizing form contracts that, as here, do not set out a standard of care, limit rights to specific disclosures, or provide express remedies for nondisclosure, for the following reasons. *See People ex rel. A.V.,* 2012 COA 210, ¶ 11 n. 1, 297 P.3d 1019 ("One division is not bound by the holding of another division.").

---

**2.** Whether the SPD is intended to frame a nondisclosure claim is unclear. The SPD does not represent or warrant the condition of the property. And the only specific remedy provided is "If the physical condition of the Property or Inclusions is unsatisfactory, in Buyer's subjective discretion, Buyer shall . . . (1) notify Seller in writing that this contract is terminated."

¶ 28 First, we reject the suggestion in *Hamon* that other jurisdictions uniformly allow the economic loss rule to trump fraud claims relating to the subject matter of a contract. *See* 229 P.3d at 292 (citing *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 670–80 (3d Cir.2002) (applying Pennsylvania law); *Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F.Supp.2d 557, 562–65 (D.N.J. 2002) (applying New Jersey law); *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 209 Mich.App. 365, 532 N.W.2d 541, 544–46 (Mich.Ct.App.1995)). Other jurisdictions have recognized an independent duty to disclose latent but known defects in residential real estate transactions.[3]

¶ 29 Second, adopting *Hamon*, the division in *TCHR* rejected the plaintiff's reliance "on section 551(2)(b) of the Restatement (Second) of Torts (1977)," to establish a disclosure duty independent of the contract. *TCHR*, ¶ 34. But our supreme court has cited this section of the Restatement with approval. *See, e.g., Mancuso v. United Bank*, 818 P.2d 732, 744 (Colo.1991). And it has not applied the economic loss rule in a misrepresentation or nondisclosure case.

¶ 30 Third, were the economic loss rule to preempt this duty based on a form contract that, as here, neither disclaims reliance nor limits required disclosures, a tort claim could *never* be brought because the statute of frauds requires a written agreement to purchase a residence. *See* § 38–10–106, C.R.S.

2013. Such a broad approach does not align with the purpose of the economic loss rule.[4]

██ ¶ 31 Fourth, a home seller's common law duty to disclose material information is a fact-specific inquiry based on the particular circumstances of the transaction. *See, e.g., Burman*, 821 P.2d at 918–19 (distinguishing facts of which home buyer was put on constructive notice from latent defects). But parties to a form residential real estate contract, who may not have legal representation, are ill-suited to anticipate all areas where disclosure may be appropriate and address them by attempting to amend the contract with transaction-specific duties and remedies.

¶ 32 Accordingly, because claims against home sellers for nondisclosure of latent but known defects are outside the scope of the economic loss rule, and because the disclosure terms in the Form Contract do not subsume a home seller's common law duty to disclose such defects, we decline to bar Gattis's nondisclosure claim based on the economic loss rule.

### III. The Trial Court Properly Awarded Gattis Attorney Fees

¶ 33 In case number 13CA0116, Sellers appeal the trial court's award of attorney fees to Gattis as the prevailing party based on the following fee-shifting provision in the Form Contact: "In the event of any ... litigation *relating to this contract*, the ... court shall award to the prevailing party all

**3.** *See Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 221 P.3d 234, 245 (Utah 2009) (holding that a geo-technical report regarding latent soil conditions was sufficient to establish the developer had "a high degree of knowledge and expertise necessary for an independent duty" if there is also privity of contract between the parties); *Eastwood v. Horse Harbor Found., Inc.*, 170 Wash.2d 380, 241 P.3d 1256, 1263 (Wash.2010) ("Independent of the obligations in a lease or a residential real estate sales contract, the vendor or lessor has an affirmative duty to disclose material facts, of which the vendor or seller has knowledge, and which are not readily observable upon reasonable inspection by the purchaser or lessee." (internal quotation marks omitted)). *Cf. Moransais v. Heathman*, 744 So.2d 973, 983 (Fla. 1999) ("[R]ecognizing that the economic loss rule may have some genuine, but limited, value in our damages law, we never intended to bar well-established common law causes of ac-

tion.... Rather, the rule was primarily intended to limit actions in the product liability context, and its application should generally be limited to those contexts or situations where the policy considerations are substantially identical to those underlying the product liability-type analysis." (footnote omitted)).

**4.** *See Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 110 So.3d 399, 407 (Fla.2013) ("Our experience with the economic loss rule over time, which led to the creation of the exceptions to the rule, now demonstrates that expansion of the rule beyond its origins was unwise and unworkable in practice. Thus, today we return the economic loss rule to its origin in products liability."); *see generally* R. Joseph Barton, Note, *Drowning in a Sea of Contract: Application of the Economic Loss Rule to Fraud and Negligent Misrepresentation Claims*, 41 Wm. & Mary L.Rev. 1789 (2000).

reasonable costs and expenses, including attorney fees." (Emphasis added.) We conclude that Gattis was entitled to attorney fees as the prevailing party on her nondisclosure claim, and that she is entitled to her attorney fees on appeal.

### A.  Standard of Review

¶ 34 Absent a specific statute, court rule, or contract provision to the contrary, attorney fees are not recoverable by a prevailing party in a contract or tort action. *Wheeler v. T.L. Roofing, Inc.*, 74 P.3d 499, 503 (Colo.App.2003). But "[f]ee-shifting provisions replace the otherwise applicable rule that the losing party does not have to pay the winner's attorney fees." *Bedard v. Martin*, 100 P.3d 584, 593 (Colo.App.2004).

¶ 35 A trial court's prevailing party determination under a contractual fee-shifting provision is reviewed for an abuse of discretion. *Dennis I. Spencer Contractor, Inc. v. City of Aurora*, 884 P.2d 326, 328 n. 6 (Colo.1994). However, interpretation of such a provision presents a legal question subject to de novo review. *Fibreglas Fabricators, Inc. v. Kylberg*, 799 P.2d 371, 374 (Colo.1990).

¶ 36 Likewise, "[t]he standard of review for the interpretation of contract terms is de novo." *Cagle v. Mathers Family Trust*, 295 P.3d 460, 465 (Colo.2013). When interpreting a contract, "[a]ny construction that would render any clause or provision unnecessary, contradictory, or insignificant should be avoided." *Mapes v. City Council*, 151 P.3d 574, 577 (Colo.App.2006).

### B.  Gattis Was the Prevailing Party

¶ 37 Sellers first contend Gattis was not the prevailing party because the economic loss rule bars her nondisclosure claim. Our conclusion that the trial court properly declined to apply the rule resolves this contention.

### C.  Gattis's Tort Claim Relates to the Contract

¶ 38 Sellers next contend Gattis is not entitled to attorney fees because the fee-shifting provision should not apply to her nondisclosure tort claim, if it is independent of Sellers' contractual obligations. The plain language of the fee-shifting provision defeats this contention.

¶ 39 Fee-shifting provisions that use broad phrases, such as "arise out of," have been interpreted as applying to all claims that originate from, grow out of, or flow from the contract at issue. *Bedard*, 100 P.3d at 593. For example, in *Sperry v. Bolas*, 786 P.2d 517, 518 (Colo.App.1989), the division concluded that even though "plaintiff [had] sought damages in tort for defendant's fraudulent misrepresentation," such a claim arose out of parties' contract.

¶ 40 Fee-shifting provisions that, as here, use the phrase "relating to" a contract have been interpreted even more "broad[ly]" than one which covers claims merely arising out of a contract." *City & County of Denver v. District Court*, 939 P.2d 1353, 1366 (Colo. 1997) (quoting *Yale Materials Handling Corp. v. White Storage & Retrieval Sys., Inc.*, 240 N.J.Super. 370, 573 A.2d 484, 486 (N.J.Super.Ct.App.Div.1990)). The terms "relating" and "relate to" have been interpreted to "encompass[ ] all issues surrounding the underlying subject matter." *In re Marriage of Ikeler*, 161 P.3d 663, 673 (Colo. 2007); *see also Meadow Homes Development Corp. v. Bowens*, 211 P.3d 743, 749 (Colo. App.2009) ("The contractual, attorney fees provision is very broad: it covers not simply actions to 'enforce' the agreement but also actions 'relating to [it] or any of its terms or provisions.' "); *Harwig v. Downey*, 56 P.3d 1220, 1222 (Colo.App.2002) (the "broadly worded phrase 'any ... litigation relating to this contract' " would apply to litigation between the contracting parties concerning a breach of the lease to which the sales contract was subject).

¶ 41 Here, despite our conclusion that Sellers' disclosure obligations were independent of their contractual duties, Gattis's nondisclosure claim concerned the subject matter of the Form Contract: the purchase and sale of the residence. Therefore, given the broad reach of litigation "related to" the parties' contract, Gattis is entitled to attorney fees under the fee-shifting provision as the prevailing party on this claim.

### D. The Fee–Shifting Provision Is Not Limited to Default

¶ 42 Alternatively, Sellers contend the "remedies" section of the Form Contract, which includes the provision on prevailing party attorney fees, only applies to claims of default involving failure to pay amounts when due "or if any other obligation hereunder is not performed or waived as herein provided, there shall be the following remedies." Sellers rely on provisions of two subsections that address applicable remedies if the buyer or seller defaults: specific performance, forfeiture of payments, and damages. Their reliance is misplaced, for two reasons.

¶ 43 First, the section is entitled, "TIME OF ESSENCE AND REMEDIES." It consists of three subsections:

- "If Buyer is in Default";
- "If Seller is in Default"; and
- "Costs and Expenses."

The fee-shifting language appears in the last subsection, which does not reference "default."

¶ 44 Second, accepting Sellers' interpretation would render the phrase "*any* arbitration or litigation *relating to* this contract" meaningless. The word "any" means "without limitation or restriction." *Nat'l Farmers Union Prop. & Cas. Co. v. Estate of Mosher*, 22 P.3d 531, 534 (Colo.App.2000). The breadth of "relating to" has been addressed. An interpretation that disregards these words must be avoided. *See Mapes*, 151 P.3d at 577.

### E. Gattis Is Also Entitled to Appellate Attorney Fees

¶ 45 Based on the fee-shifting provision, Gattis seeks appellate attorney fees. Such an award is appropriate because, for reasons previously discussed, this appeal constitutes litigation relating to the Form Contract, and Gattis has prevailed in the appeal. *See, e.g., Ranta Constr., Inc. v. Anderson*, 190 P.3d 835, 847 (Colo.App.2008) (awarding attorney fees on appeal pursuant to a prevailing party attorney fee provision in underlying agreement). However, because the trial court is better situated to address the amount of such fees, we exercise our discretion under C.A.R. 39.5 and remand for the trial court to determine and award a reasonable amount of attorney fees incurred on appeal.

### IV. Conclusion

¶ 46 The judgment and attorney fees award are affirmed. The case is remanded to determine the amount of appellate attorney fees.

JUDGE BERNARD and JUDGE DUNN concur.