23CA0829 Riley v Crespi 07-25-2024 COLORADO COURT OF APPEALS Court of Appeals No. 23CA0829 Routt County District Court No. 20CV30066 Honorable Michael A. O’Hara III, Judge Daniel Riley, Plaintiff-Appellant, v. Nicholas Crespi and Shelley Chesson n/k/a Shelley Crespi, Defendants-Appellees. JUDGMENT AFFIRMED AND CASE REMANDED WITH DIRECTIONS Division II Opinion by JUDGE SULLIVAN Fox and Grove, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced July 25, 2024 Ian K. London, Steamboat Springs, Colorado; Wilcox Law Firm, LLC, Ronald L. Wilcox, Denver, Colorado, for Plaintiff-Appellant Hall & Evans, LLC, Thomas L. Beam, Brian Molzahn, Denver, Colorado, for Defendants-Appellees 
1 ¶ 1 In this landlord-tenant dispute, plaintiff, Daniel Riley, appeals the judgment entered on jury verdicts in favor of defendants, Shelley and Nicholas Crespi, on their counterclaims for (1) extreme and outrageous conduct and (2) breach of the covenant of good faith and fair dealing. We affirm and remand the case with directions. I. Background ¶ 2 In February 2019, the Crespis entered into a one-year rental agreement (the Lease) with Riley, agreeing to pay $2,300 per month for a three-bedroom, two-bath upstairs unit in a duplex in Steamboat Springs. The Crespis renewed the Lease in 2020 at the same rate, extending the term through April 2021. ¶ 3 The Lease provided that the Crespis could terminate the agreement early, provided that they found a suitable replacement tenant and paid a fee equal to 200% of the new tenant’s monthly rent. The Lease stated the replacement tenant “must, in [Riley’s] discretion, be acceptable as a tenant” and sign either (1) a new lease on terms “not less favorable” to Riley than the Crespis’ Lease or “otherwise acceptable to [Riley]”; (2) a sublease with terms 
2 approved by Riley; or (3) an assignment of the Lease in a form approved by Riley. ¶ 4 In June 2020, the Crespis notified Riley that they intended to exercise the Lease’s early termination provision. Ms. Crespi’s mother was terminally ill, and the Crespis intended for her, and potentially other family members, to move in with them, necessitating a larger space. Ms. Crespi’s mother required a handicap-accessible home and couldn’t ascend the stairs to their unit; the unit’s space also wasn’t large enough should other family members or an in-home hospice provider need to move in. The Crespis considered moving Ms. Crespi’s mother into a nursing home but visiting restrictions due to the COVID-19 pandemic would have prevented them from spending meaningful time with her during her final days. Ms. Crespi was also pregnant at the time. Ms. Crespi testified that Riley was at least partially aware of these life circumstances that motivated their need to change residences. ¶ 5 After the Crespis informed Riley of their plan to terminate the Lease early, Riley proposed a new termination agreement that would remove the Crespis’ obligation to find a new tenant. But it came with a steep early termination fee — approximately four times 
3 the Crespis’ monthly rent, or about $9,000.
1 When the Crespis didn’t agree, Riley made additional early termination proposals that sought additional fee amounts. ¶ 6 When negotiations stalled, the Crespis began their search for a suitable replacement tenant. They referred at least three prospective tenants to Riley, but he rejected each for varying reasons. The Crespis stopped referring potential replacements to Riley and moved out as planned at the end of July. They didn’t pay an early termination fee and stopped paying rent after July. ¶ 7 In September 2020, Riley filed this lawsuit, alleging that the Crespis breached the Lease. The Crespis answered the complaint and counterclaimed that Riley engaged in extreme and outrageous conduct, violated the implied duty of good faith and fair dealing, and breached the Lease by failing to return their security deposit. ¶ 8 During the four-day jury trial, Riley moved for a directed verdict on the Crespis’ extreme and outrageous conduct counterclaim. The court deferred ruling but denied the motion after 1 The record is somewhat unclear on the exact amount. Riley’s proposed written early termination agreement states the fee was $9,000, but he testified that he proposed a fee of $9,200. 
4 trial, determining that a reasonable juror could find that Riley’s actions or inaction constituted intentional infliction of emotional distress. ¶ 9 The jury found in the Crespis’ favor on their counterclaims for extreme and outrageous conduct and breach of the covenant of good faith and fair dealing, awarding $51,000 and $1 in damages, respectively. It also found that Riley failed to prove his breach of contract claim. ¶ 10 After trial, Riley moved for judgment notwithstanding the verdict, arguing (1) insufficient evidence supported the jury’s verdict that he engaged in extreme and outrageous conduct, and (2) he was entitled to judgment as a matter of law on the Crespis’ counterclaim for breach of the covenant of good faith and fair dealing. See C.R.C.P. 59(a)(2). In a detailed order, the trial court denied Riley’s motion, finding in part that the evidence presented at trial supported the jury’s verdicts. ¶ 11 Riley now argues on appeal that the Crespis failed to meet their burden to prove that (1) Riley engaged in extreme and outrageous conduct, and (2) Riley violated the covenant of good faith and fair dealing by failing to accept the replacement tenants 
5 proposed by the Crespis. The trial court therefore erred, Riley argues, by denying his motions for directed verdict and judgment notwithstanding the verdict on these two counterclaims. II. Extreme and Outrageous Conduct ¶ 12 We first address Riley’s argument that insufficient evidence supported the jury’s verdict that he engaged in extreme and outrageous conduct. As part of his argument, Riley asserts that the trial court erred in finding that the COVID-19 pandemic lowered the Crespis’ evidentiary burden for their extreme and outrageous conduct counterclaim. We perceive no error. A. Standard of Review ¶ 13 C.R.C.P. 50 authorizes a party to move for a directed verdict after the opposing party completes its case in chief. “The district court should only grant a motion for a directed verdict where ‘the evidence compels the conclusion that reasonable [people] could not disagree and that no evidence or inference therefrom has been received at trial upon which a verdict against the moving party could be sustained.’” Argo v. Hemphill, 2022 COA 104, ¶ 18 (quoting Schuessler v. Wolter, 2012 COA 86, ¶ 33). In considering a directed verdict motion, the court views the evidence in the light 
6 most favorable to the nonmoving party. State Farm Mut. Auto. Ins. Co. v. Goddard, 2021 COA 15, ¶ 25. ¶ 14 A court may grant a motion for judgment notwithstanding a verdict where (1) the evidence supporting the verdict is insufficient as a matter of law; or (2) no genuine issue as to any material fact exists, and the moving party is entitled to judgment as a matter of law. C.R.C.P. 59(e); Belfor USA Grp., Inc. v. Rocky Mountain Caulking & Waterproofing, LLC, 159 P.3d 672, 676 (Colo. App. 2006). ¶ 15 We review de novo the trial court’s denial of a motion for directed verdict or a motion for judgment notwithstanding the verdict. Smith v. Surgery Ctr. at Lone Tree, LLC, 2020 COA 145M, ¶ 8. Similarly, whether reasonable persons could differ on the outrageousness of a party’s conduct is a question of law that we review de novo. Green v. Qwest Servs. Corp., 155 P.3d 383, 385 (Colo. App. 2006). B. Applicable Law ¶ 16 To prevail on a claim for extreme and outrageous conduct, a plaintiff must prove that “(1) the defendant engaged in extreme and outrageous conduct, (2) recklessly or with the intent of causing the 
7 plaintiff severe emotional distress, and (3) causing the plaintiff severe emotional distress.” Id. The defendant’s conduct toward another must be “so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.” Id. (quoting Destefano v. Grabrian, 763 P.2d 275, 286 (Colo. 1988)). ¶ 17 We evaluate outrageousness in the context of the totality of the conduct, whether during a single incident or a series of incidents. See Zalnis v. Thoroughbred Datsun Car Co., 645 P.2d 292, 294 (Colo. App. 1982) (courts are more likely to find outrageous conduct in a series of incidents or a course of conduct than in a single incident). If reasonable persons could differ on whether a series of acts is outrageous, the trial court must deny motions for a directed verdict and judgment notwithstanding the verdict. Meiter v. Cavanaugh, 40 Colo. App. 454, 457, 580 P.2d 399, 401 (1978). C. Additional Background ¶ 18 Ms. Crespi testified that Riley responded to their first request to terminate the Lease early by stating that his business partner serves as a federal judge in Texas, that they’ve had many tenants 
8 attempt to move out early, that they “never lose” in court, and “I dare you to try.” ¶ 19 Ms. Crespi testified that things escalated when they refused to capitulate to Riley’s demands. She started observing Riley drive by their apartment slowly, noting “six or so” such incidents. Ms. Crespi said that a person on the street could see into their home — including the bedroom, kitchen, and dining room — because the unit’s windows face the street. She testified that, before June, Riley hadn’t driven by their unit or shown up “randomly” since he lived in Texas and typically relied on others for tasks like lawn care. Ms. Crespi explained that she was often home alone and interpreted Riley’s behavior as stalking, bullying, and intimidation. According to Ms. Crespi, she felt vulnerable and afraid because Riley had a key to their unit. ¶ 20 In late June, during a family brunch celebrating their wedding, Riley disturbed the Crespis by weed whacking grass at the bottom of the stairs leading to their unit. According to Ms. Crespi, Riley knew it was their wedding celebration because Mr. Crespi had previously talked to him about their wedding date. Ms. Crespi testified that Riley intentionally interrupted their celebration 
9 because they didn’t meet his deadline one day earlier for accepting his latest early termination offer. She explained that Riley didn’t normally perform lawn work himself and that the lawn had just been mowed the prior Friday, so it was already “fine.” She interpreted Riley’s actions as intimidation. ¶ 21 In response to this perceived stalking, bullying, and intimidation, the Crespis purchased weapons and asked the local newspaper not to publish the address of their new home when listing recent property purchases. A family member also purchased the Crespis a Ring doorbell security camera. D. Analysis ¶ 22 We first address Riley’s contention that the trial court erred by finding that the COVID-19 pandemic lowered the Crespis’ evidentiary burden for their extreme and outrageous conduct counterclaim. ¶ 23 Contrary to Riley’s argument, the record reflects that the trial court didn’t lower the Crespis’ evidentiary burden. True, the trial court expressed some skepticism during argument on Riley’s directed verdict motion over whether, absent the COVID-19 pandemic, the Crespis had presented sufficient evidence to 
10 establish a prima facie case for extreme and outrageous conduct. But the court deferred ruling on Riley’s directed verdict motion and allowed the jury to decide the Crespis’ counterclaim. After the jury returned its verdict in the Crespis’ favor, the court denied Riley’s motions for directed verdict and judgment notwithstanding the verdict in written orders. Nowhere in those orders does the trial court state that it held the Crespis to a lower evidentiary burden due to COVID-19. To the contrary, the court stated that whether, and how, the COVID-19 pandemic may have affected the community’s views of Riley’s actions “is a question that falls squarely in the purview of the jury.” ¶ 24 We next turn to Riley’s challenge to the sufficiency of the evidence supporting the jury’s verdict on the Crespis’ counterclaim for extreme and outrageous conduct. While the jury heard conflicting evidence, we agree with the trial court that, considering the totality of the evidence in the light most favorable to the Crespis, reasonable persons could differ on whether Riley’s conduct amounted to extreme and outrageous conduct. See Zalnis, 645 P.2d at 294. 
11 ¶ 25 The jury heard testimony, for example, that Riley informed the Crespis that his business partner is a federal judge and that they “never lose” in court. A juror could infer from this statement that Riley implied that his business partner holds special influence in the judicial system and wasn’t afraid to wield it. See Meiter, 40 Colo. App. at 457, 580 P.2d at 401 (finding outrageous conduct claim properly went to the jury, in part, because defendant suggested that, as an attorney, “he would have some special influence in any judicial proceeding”); see also Farmers Grp., Inc. v. Trimble, 658 P.2d 1370, 1377 (Colo. App. 1982) (otherwise permissible conduct may become extreme and outrageous if an actor abuses a position in which he has “actual or apparent authority over the other, or the power to affect the other’s interests” (quoting Zalnis, 645 P.2d at 294)), aff’d, 691 P.2d 1138 (Colo. 1984). ¶ 26 The jury also heard testimony regarding Riley’s disruptive weed whacking during the Crespis’ wedding brunch. Ms. Crespi testified that Riley, who had never tended to the house before, intentionally interrupted their brunch in retaliation for the Crespis failing to pay his demanded termination fee by the prior day’s 
12 deadline. She testified that Riley knew about their wedding celebration and that, even though the lawn had been mowed the prior Friday and was “fine,” Riley chose that particular moment to weed whack a small patch of grass at the bottom of the stairs that led to their unit. ¶ 27 Finally, the jury heard testimony about Riley’s repeated acts of slowly driving by the Crespis’ unit — acts that Ms. Crespi testified coincided with Riley’s exorbitant termination fee demands and that she interpreted as stalking and bullying. Cf. Rugg v. McCarty, 173 Colo. 170, 176-77, 476 P.2d 753, 756 (1970) (oppressive conduct by creditor in collecting a debt may amount to extreme and outrageous conduct). Ms. Crespi testified that Riley had never driven by their unit before they refused his demands, and she felt afraid because Riley possessed a key to their unit, and she was often home alone. ¶ 28 While we have reservations whether any of these incidents, in isolation, is sufficiently extreme and outrageous to amount to “atrocious, and utterly intolerable” conduct, Destefano, 763 P.2d at 286 (citation omitted), we conclude that reasonable persons could differ on whether Riley’s series of acts together amounted to outrageous conduct, see Zalnis, 645 P.2d at 294. To the extent the 
13 evidence was susceptible to different or conflicting inferences, it was for the jury to weigh the evidence and appraise the witnesses’ credibility. See Hurricane v. Kanover, Ltd., 651 P.2d 1218, 1221–22 (Colo. 1982). As a result, the trial court properly submitted the issue to the jury as the trier of fact. See Enright v. Groves, 39 Colo. App. 39, 43, 560 P.2d 851, 854 (1977). ¶ 29 Accordingly, the trial court didn’t err by denying Riley’s motions for directed verdict and judgment notwithstanding the verdict on the Crespis’ counterclaim for extreme and outrageous conduct. III. Covenant of Good Faith and Fair Dealing ¶ 30 Next, Riley argues that he didn’t abuse his discretion when he rejected the replacement tenants referred to him by the Crespis, and, therefore, the trial court erred by denying his motion for judgment notwithstanding the verdict on the Crespis’ counterclaim for breach of the covenant of good faith and fair dealing. We discern no error. A. Procedural Issues ¶ 31 At the outset, we resolve two procedural issues. First, Riley’s briefing suggests that he moved for a directed verdict on the 
14 Crespis’ counterclaim for breach of the covenant of good faith and fair dealing. But the record reflects that his directed verdict motion was limited to his breach of contract claim and the Crespis’ counterclaim for extreme and outrageous conduct. We therefore address only his motion for judgment notwithstanding the verdict on the Crespis’ counterclaim for breach of the covenant of good faith and fair dealing. ¶ 32 Second, we reject the Crespis’ argument that the invited error doctrine bars Riley from appealing the trial court’s denial of this motion. We recognize that Riley conceded during argument on his directed verdict motion that the Crespis presented sufficient evidence on their counterclaim for breach of the covenant of good faith and fair dealing to send the claim to the jury. But the Crespis cite no authority, and we’ve located none, suggesting that a party’s concession of this type, made during a mid-trial directed verdict motion under C.R.C.P. 50, precludes the party from later moving post-trial for judgment notwithstanding the verdict under C.R.C.P. 59. Indeed, by stating that a directed verdict motion “shall not be a prerequisite to any form of post-trial relief, including judgment notwithstanding the verdict,” C.R.C.P. 59(e) suggests that 
15 a party isn’t irrevocably bound in the post-trial stage by the positions he takes at the directed-verdict stage. We therefore elect to address the merits of Riley’s argument. B. Standard of Review ¶ 33 As before, we review de novo the trial court’s denial of a motion for judgment notwithstanding the verdict. Smith, ¶ 8. C. Applicable Law ¶ 34 Under Colorado law, “[e]very contract contains an implied duty of good faith and fair dealing.” Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc., 872 P.2d 1359, 1363 (Colo. App. 1994). The duty of good faith and fair dealing applies when one party has discretionary authority to determine certain terms of the contract. Amoco Oil Co. v. Ervin, 908 P.2d 493, 498 (Colo. 1995). Discretion occurs when the parties, at formation, defer a decision regarding performance terms of the contract, but that decision may not contradict terms or conditions for which a party has bargained. Id. D. Additional Background ¶ 35 The Lease allowed the Crespis to terminate early with certain conditions. It required the Crespis to find a replacement tenant and pay an early termination fee of 200% of the replacement tenant’s 
16 monthly rent.
2 Riley proposed a series of alternative agreements that would relieve the Crespis of their obligation to find a new tenant, but only if they agreed to pay an increased termination fee ranging between $9,000 and $11,700. ¶ 36 The Crespis declined Riley’s proposed alternative agreements and instead chose to search for a replacement tenant as contemplated by the Lease. They proposed at least three replacements, each of whom Riley rejected for various reasons including, as relevant here, objections to roommates and having more than one pet. ¶ 37 As to roommates, Ms. Crespi also testified that, when they first moved in, they spoke to Riley about the possibility of having a roommate and Riley was open to the idea. Riley testified that he would have accepted a third occupant who was a family member of the Crespis had they asked. But when one of the Crespis’ potential replacement tenants, Ali Gaass, said she wanted to move in with her boyfriend and brother, Riley found them unacceptable. While 2 Riley informed the Crespis that he believed the unit’s market rate was $2,800 to $2,900 per month. He eventually rented the unit to a new tenant for $2,750 per month. 
17 the Lease states that the new lease’s terms must not be “less favorable” to the landlord, nothing in the Lease specifically prohibits family-member roommates or limits occupancy to two people. Rather, paragraph 12.A of the Lease contemplates that the parties may designate who will live on the premises, a field that the parties in this case left blank. ¶ 38 As to pets, Ms. Crespi testified that Riley allowed her downstairs neighbors to have two pets. The Lease also shows that Riley allowed the Crespis to have a pet by signing a pet agreement addendum. But when Ms. Crespi referred a potential replacement tenant who had two pets, Lauren Johnson, Riley refused to approve the sublease. E. Analysis ¶ 39 We conclude that sufficient evidence supported the jury’s verdict for the Crespis on their counterclaim for breach of the covenant of good faith and fair dealing, and therefore, the court didn’t err by denying Riley’s motion for judgment notwithstanding the verdict. ¶ 40 Contrary to Riley’s argument, paragraph 12.A of the Lease says nothing about limiting occupancy to the named tenants, nor 
18 does it place limits on occupancy or family-member roommates. The jury heard evidence that Riley, in his discretion, found some three-occupant arrangements acceptable but not others. From this, the jury could infer that Riley was “raising an imaginary dispute” by rejecting Ms. Gaass as a replacement tenant. Bayou Land Co. v. Talley, 924 P.2d 136, 155 n.28 (Colo. 1996) (citing Restatement (Second) of Contracts § 205 cmt. e (Am. L. Inst. 1981)). And given the financial incentives that Riley had to avoid approving a subletting tenant found by the Crespis (he planned to increase the next tenant’s monthly rent through a new lease and expected to receive a higher termination fee if the Crespis didn’t find a suitable replacement), the jury could have found that his discretionary refusal to approve Ms. Gaass amounted to a breach of the covenant of good faith and fair dealing. ¶ 41 The jury could also infer that Riley’s refusal to accept Ms. Johnson, who had two pets, similarly suggests that he exercised his discretion in bad faith. While the Lease generally prohibits pets, it contemplates that pets are allowed if the parties agree in writing. Riley previously exercised discretion with the Crespis to allow pets, executing a pet agreement addendum to the Lease. Ms. Crespi 
19 testified that he also allowed their downstairs neighbors to have two pets. Riley’s decision, in his discretion, to refrain from executing a similar pet agreement addendum with Ms. Johnson is evidence from which the jury could find that Riley violated the covenant of good faith and fair dealing. ¶ 42 Accordingly, because the record supports the jury’s verdict on the Crespis’ counterclaim for breach of the covenant of good faith and fair dealing, the trial court didn’t err by denying Riley’s motion for judgment notwithstanding the verdict.
3 IV. Appellate Attorney Fees ¶ 43 The Crespis seek their appellate attorney fees under the fee-
shifting provision in the Lease that allows the prevailing party to recover their attorney fees incurred in any legal proceeding brought under or related to the transaction described in the Lease. Based on the “entitled to recover” language in paragraph 29 of the Lease, we agree that the Crespis are entitled to their reasonable appellate attorney fees. See In re Estate of Gattis, 2013 COA 145, ¶ 45. We 3 We also reject Riley’s argument that the trial court somehow erroneously “foreclosed” his own breach of contract claim. The jury foreperson confirmed in open court that the jury didn’t reach a verdict in Riley’s favor on his breach of contract claim. 
20 remand to the trial court for it to determine and award the Crespis their reasonable attorney fees incurred on appeal. See C.A.R. 39.1. V. Disposition ¶ 44 We affirm the judgment and remand to the trial court for it to determine and award the Crespis their reasonable appellate attorney fees. JUDGE FOX and JUDGE GROVE concur.